RAILROAD COMMISSION OF ALABAMA et al. **v.** CENTRAL OF GEORGIA RY. CO.

(Circuit Court of Appeals, Fifth Circuit. April 6, 1909. Rehearing Denied April 19, 1909.)

Nos. 1857–1862.

**1.** CARRIERS (§ 18*)—SUIT TO RESTRAIN ENFORCEMENT OF STATUTE REGULATING RATES—PRELIMINARY INJUNCTION.

A preliminary injunction is not a matter of strict right, and it is often the duty of a court to refuse such an injunction where it is doubtful what upon the final hearing may be ascertained to be the real facts in the case, and where the rights of the complainants are such that they will suffer no more injury if they finally succeed than would be inflicted upon the defendants if unjustly enjoined. Especially is this true where it is sought to enjoin the operation of a state law fixing railroad rates alleged to be confiscatory but which has not yet gone into effect, when it is probable that a practical test of the law will be required to ascertain the truth, and in such case an injunction should not be granted on ex parte affidavits alone merely stating opinions.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

**2.** CARRIERS (§ 18*)—SUIT TO RESTRAIN ENFORCEMENT OF STATUTE REGULATING RATES—PRELIMINARY INJUNCTION.

In a suit by railroad companies to enjoin the enforcement of rates fixed by a state law as confiscatory, the fact that bonds may be required from complainants for the protection of passengers and shippers against loss from overcharges if the law shall be finally held valid is not a sufficient ground for granting preliminary injunctions, it being evident that such bonds would not practically give adequate protection to many of such passengers and shippers, where the amount involved was small.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

**3.** INJUNCTION (§ 137*) — PRELIMINARY INJUNCTION — GROUNDS—RESTRAINING ENFORCEMENT OF STATUTE.

The public has an interest in the enforcement of every law until it is repealed or judicially annulled, which should be taken into consideration before granting a preliminary injunction restraining its enforcement where questions of fact are involved.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 137.*]

**4.** APPEAL AND ERROR (§ 954*) — REVIEW—ORDER GRANTING PRELIMINARY INJUNCTION.

On appeals from orders granting preliminary injunctions restraining the putting into effect of railroad rate statutes which are prima facie valid, their invalidity depending on facts to be proved, the effect of such injunctions being to prevent a practical test of the law before the final hearing, it is the duty of the appellate court to examine the whole case on the law and the facts, regardless of the usual rule as to the weight to be given to the decision of the court below in matters involving the exercise of discretion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3818–3821; Dec. Dig. § 954.*]

**5.** CONSTITUTIONAL LAW (§ 62*)—DELEGATION OF LEGISLATIVE POWER TO FIX RATES—VALIDITY OF STATUTE.

The provision of the Alabama railroad rate statute of August 9, 1907 (Gen. Acts Ala. 1907, p. 711), authorizing the State Railroad Commission to change rates fixed by statute from time to time as conditions may in its judgment render it expedient or proper to do so. is not void as an at-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
170 F.—15

tempted delegation of legislative power in violation of section 243 of the state Constitution of 1901, which confers power to regulate rates on the Legislature.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 94-102; Dec. Dig. § 62.*]

6. STATUTES (§ 64*)—VALIDITY—EFFECT OF INVALID PROVISIONS.

The validity of state statutes regulating railroad rates is not dependent on the question of the validity of provisions imposing penalties for their violation, where such provisions are not a necessary and inseparable part of the acts.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58-66, 195; Dec. Dig. § 64.*]

Pardee, Circuit Judge, dissenting.

Appeals from the Circuit Court of the United States for the Middle District of Alabama.

Bill against the Railroad Commission of Alabama and another by the Central of Georgia Railway Company. With this were heard bills against the Railroad Commission of Alabama and another by the Central Trust Company of New York, by the Western Railway of Alabama, by the South & North Alabama Railroad Company, by the Nashville, Chattanooga & St. Louis Railway, and by the Louisville & Nashville Railroad Company.

For opinion below, see 161 Fed. 925.

The bills in these cases were filed to enjoin the enforcement of certain passenger and freight rates statutes of the state of Alabama, upon the claim that they were confiscatory in their effect upon the property of the complainant railroad companies.

In all the cases, except that of the Central Trust Company of New York, original bills were filed in the United States Circuit Court at Montgomery, in the latter part of March, 1907, against the three members of the Railroad Commission of Alabama, and also against A. M. Garber, Attorney General of the state of Alabama. The bill of the Central Trust Company was filed on December 3, 1907, at or about the same time that the other complainant railroad companies filed their supplemental bills. In the original bills of the railroad companies, they assailed certain legislation enacted at the regular session of the Legislature of Alabama in 1907, and the supplemenal bills and the original bill of the Central Trust Company also assailed certain legislation of the special session of the Legislature of Alabama held in November, 1907. The Central Trust Company assailed also the passenger rate acts of the regular session of 1907.

The legislation enacted at the regular session, and assailed by the original bill, is as follows:

(1) An act approved February 14, 1907, establishing for steam railroads in the state engaged in carrying passengers a charge not exceeding 2½ cents per mile per passenger for carrying any passenger from one point to another in Alabama. Gen. Acts Ala. 1907, p. 104.

(2) An act approved March 2, 1907, which classified certain articles, and also classified the railroads, and which fixed the maximum rate to be charged by railroads in the state of Alabama for the transportation, originating and terminating in the state, of said articles, 110 in number, and which is known as the "110 Commodity Act." Gen. Acts Ala. 1907, p. 209. This act was repealed at the special session of November, 1907.

(3) An act, approved February 9, 1907, known as the "Maximum Rate Bill," which made the railroad freight rates in force January 1, 1907, for transportation originating and terminating within the state, the maximum rates. Gen. Acts Ala. 1907, p. 80.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

On August 9, 1907, the Legislature, by statute then approved, authorized the Railroad Commission to change any classification of railroad, or of any articles of freight, or any maximum rates or charges, for the transportation of passengers or freight over any railroad in this state which have been or may hereafter be prescribed by statute, or any prevailing rates or charges for such transportation which have been or may hereafter be by statute made the maximum rates or charges, and to change such rates and classifications, or any of them, from time to time, as conditions may, in its judgment, render it expedient or proper to do so, whether the effect of such change be to increase or reduce any of such rates or charges, and to establish and order to be put in force in lieu thereof any new classification or rate or charge which it may deem reasonable or proper; and the classifications, rates, or charges so established by it shall be the legal classifications, rates, or charges until further changed by said Railroad Commission. Section 2 of the act provides that the changes may be made by the Railroad Commission upon its own motion, or upon complaint or petition of any railroad company affected by such classification or rates, or of any person, firm, corporation, or association, or of any mercantile, agricultural, or manufacturing society, or of any body politic or municipal corporation or organization; but no such change shall be made which shall have the effect of reducing any such rates or charges, except upon an investigation or hearing had after at least 10 days' notice to the railroad company or companies to be affected by such change. Gen. Acts Ala. 1907, p. 711.

(4) The original bills also complained of certain provisions of the acts of the Legislature of Alabama, set forth therein, which made the charging of a higher fare than that prescribed by the acts a misdemeanor, and which also imposed upon the officer, agent, or employé of any railroad company who violated the provisions of the act a penalty, upon conviction, of a fine and imprisonment. The penal provisions complained of by the original bills were repealed at the special session of the Legislature, and different provisions made, to be hereafter referred to.

(5) The original bills also referred to and set up certain provisions of the statutes of Alabama, enacted at the regular session of 1907, whereby provision was made for proceedings to contest the validity, fairness, or reasonableness of freight and passenger rates established by the Railroad Commission, or by statute, or made by statute the maximum rates. These provisions were repealed at the special session of the Legislature, and hence are not given in detail, another proceeding for contest of rates before the Railroad Commission, with right of appeal, being then prescribed, as will hereafter be stated.

(6) The original bills also referred to certain statutes making it the duty of the Railroad Commission and of the Attorney General to enforce the passenger and freight rates, by suit or otherwise; but at the special session of the Legislature, as will hereafter appear, the power and duty upon the part of said officials to enforce the rates were withdrawn, and said officials were forbidden to enforce them.

Shortly after the filing of the original bills in March, 1907, injunctions were granted against the members of the Railroad Commission and the Attorney General, as prayed for in the original bills, and enforcement of the passenger rate act and of the commodity rate act was restrained pending the suit.

On November 23, 1907, at a special session, eight separate statutes were enacted by the Legislature, fixing the maximum rates to be charged by railroads for intrastate transportation of certain articles or commodities, to be known as group 1, 2, 3, 4, 5, 6, 7, and 8 respectively, and for this purpose to classify the railroads. Gen. Acts Ala. Sp. Sess. 1907, pp. 91, 101, 109, 117, 125, 135, 143, 152. These acts are exhibited with the supplemental bills, and they provide, in section 3, p. 93, that, "until otherwise provided by an order of the Railroad Commission, the maximum rates to be charged for the transportation" of the articles named in the schedule of maximum rates for freight, known as a certain group, numbered in the bill, should not exceed the rates named and specified therein.

The Legislature, at the special session, did not alter or amend the passenger rate bill enacted at the regular session, but it repealed the "110 Commodity Bill," as heretofore stated.

At the special session, the Legislature enacted a statute, approved November 23, 1907, entitled, "An act to provide for and authorize appeals from any action or order of the Railroad Commission of Alabama affecting or relating to, or reducing or increasing or refusing to increase, any rates, fares or charges by common carriers for the transportation of property, freight or passengers, specifically prescribed by statute, or made the maximum rates by statute, or established by said Railroad Commission." Gen. Acts Al 1. Sp. Sess. 1907, p. 49.

The Legislature also enacted at its special session a statute, approved November 23, 1907, excluding from the Railroad Commission, and the members thereof, and the Attorney General, all power, authority, or duty to enforce any rates, fares, or charges for the transportation of property or passengers which have been or which may hereafter be prescribed by statute or made the maximum rates by statute, or any law now existing, or which may hereafter be enacted, prescribing such rates, charges, or fares, or any rates, fares, or charges which have been or which may hereafter be established by the Railroad Commission's orders fixing the same, and all power and authority to instruct, direct, or request the Attorney General to institute any legal proceedings or to enforce such rates, fares, charges, statutes, or orders. Gen. Acts Ala. Sp. Sess. 1907, p. 28.

Other acts referred to in the supplemental bills, were passed at the special session of the Legislature, prescribing penalties and forfeitures designed to secure compliance with the rate laws.

The Railroad Commission of Alabama was created by an act, entitled "An act to create a Railroad Commission, to be known as the 'Railroad Commission of Alabama,' define its duties and powers and provide for its mode of procedure and prescribe penalties for violation of its orders," approved February 23, 1907. Gen. Acts Ala. 1907, p. 135.

The act is too long to be set out in full, but it confers power upon the Railroad Commission to supervise, regulate, and control transportation companies doing business in the state in all matters relating to the performance of their public duties and their charges therefor, and the commissioners were thereby authorized, from time to time, to prescribe rates as may seem reasonable and just, which rates the commission may, from time to time, alter or amend; but it did not authorize the commission to increase rates or charges that had been fixed by statute. However, a later statute conferred this power upon the commission, as above stated. Section 14 of the act creating the commission conferred upon it the power and authority, subject at all times to the control of the Legislature, of regulating railroad freight and passenger tariffs, and requiring reasonable and just rates of freight and passenger tariffs. The act conferred many other powers upon said commission usually found in such statutes. Of course, the commission could regulate intrastate rates only.

Section 25 of the act authorized the commission, whenever it believed that any rate or charge was unreasonable or unjustly discriminatory, upon its own motion to investigate the same. After such investigation, the commission was authorized to order a hearing and determine whether the rate so investigated was unreasonable or unjustly discriminatory.

By section 30 of said act, it is provided that whenever, upon an investigation under the provisions of the act, the commission shall find an existing rate or rates to be unreasonable or unjustly discriminatory, it shall so determine, and by order fix a reasonable rate or fare or joint rate to be imposed, observed, and followed in the future in lieu of that found to be unreasonable or unjustly discriminatory; and it shall cause a certified copy of such order to be delivered to any officer, superintendent, or station agent of the transportation company affected, which order shall, of its own force, take effect and become operative 20 days after the service thereof.

By section 31 of the act, the commissioner, at any time, on notice to the transportation company, and after an opportunity for it to be heard, was authorized to rescind, alter, or amend any order made by the commission fixing any rate or rates; and certified copies of the same shall be served, and take effect, as provided for original orders.

By section 35 of the act, it is provided that "all rates, fares, charges, classifications and joint rates and orders establishing rules, regulations, practices or

services, fixed by the commission, shall be in force and shall be prima facie reasonable, until finally found otherwise * * * or until changed by the commission."

The commission, however, by the act passed in November, 1907, was forbidden to take action to enforce its rate orders, as has already appeared.

After the enactment of the legislation at the special session of November, 1907, the railroad companies filed supplemental bills, and the Central Trust Company filed its original bill, assailing the legislation enacted at the special session and seeking to enjoin the enforcement of the eight commodity acts, the passenger rate act, the acts providing for forfeiture, fines, and penalties against the railroad companies, their officers, agents, and servants, also the several acts authorizing the Railroad Commission to establish rates, or to alter, amend, or change the rates established by statute or otherwise, for the transportation of passengers and freight between points in the state of Alabama. Upon said supplemental bills, and upon the said original bill of the Central Trust Company injunctions were granted.

The orders made, superseding the rate bills and granting the injunctions in the several cases, were very similar. We refer to one of the decrees from which the appeals were taken as typical of all.

After overruling various motions and objections filed by the defendants, or some of them, with a view to preventing the granting of the order sought by the complainants, the Circuit Court ordered and decreed, in substance, as follows:

(1) That the several rates established by the eight acts of the Legislature of Alabama, styled the "Commodity Acts," and any and all modifications or changes that may be, or may have been, made therein by the Railroad Commission of Alabama, or that may be authorized by the Code of Alabama of 1907, be and the same are superseded and suspended until the final hearing and determination of the cause.

(2) The defendants, W. F. Vandiver and the other individuals and corporations named, "and all shippers or consignees of freight and all other passengers and persons," were restrained from instituting or prosecuting any suit or suits against complainant, in their own name or names, or in the name of the state of Alabama, to recover of complainant any fines, penalties, or forfeitures for or on account of any refusal by complainant to transport, between points in the state of Alabama, any passenger or passengers upon its railroad, at a rate of 2½ cents per mile, or at the rate of 2¾ cents per mile, or at any rate less than 3 cents per mile, fixed or that may be fixed by the Railroad Commission of Alabama; or for or on account of complainant's having charged, exacted, or received more than 2½ cents per mile, or more than the rate of 2¾ cents per mile, for transportation between points in the state of Alabama of a passenger or passengers; or for charging for the transportation of any of the commodities provided for in one or more of the said several acts in complainant's first supplemental bill referred to and styled "Commodity Acts," which said commodity acts are each approved November 23, 1907, and are entitled as stated in the order. The same parties were also restrained from instituting or prosecuting any suit or suits against complainant under the other statutes referred to in the order, under which suits might have been brought for damages, penalties, or forfeitures, by reason of the failure of the complainant to comply with the passenger rate statute.

(3) The decree also restrained D. C. Almon and the other individuals named, who were the solicitors or prosecuting attorneys in the counties in or through which complainant's road was operated; and the order for injunction included "their substitutes and successors in office, and all other persons, whether acting by procurement or in their stead, or otherwise"; and such solicitors and all other persons so acting were by the order restrained "from instituting or causing to be instituted, prosecuting or causing to be prosecuted, or aiding in prosecuting, any criminal proceeding of any kind or character whatsoever against complainant, its officers, agents, or servants, or against any of them, for any act done or committed, or that may hereafter be done or committed, by complainant, its officers, agents, or employés, or any of them, in violation or alleged violation of the provisions of the acts of the Legislature of the state of Alabama, passed at its regular and special sessions held in the year

1907, or either of them, fixing, regulating, or relative to the rates at which carriers shall transport freight between points in the state of Alabama, or in violation of the provisions of any of said acts, or in violation of the provisions of the Code of Alabama of 1907 relative to said matters, or any of them, or in violation of any order of the Railroad Commission of Alabama fixing or regulating fares for the transportation of passengers at less than three cents per mile, or freight at less than complainant's rate in force at the commencement of this action on March 25, 1907; and from further drawing any affidavit, complaint, indictment, or warrant of arrest against complainant or its officers, agents, or employés, or any of them, charging it or them with noncompliance with the statute to prevent, by the use of fences, bars, etc., persons intending to take passage at a regular station from reaching or boarding the train.

(4) The order further restrained T. W. Smith and the other individuals named as clerks of courts in the several counties of the state, "the deputy or deputies of either of them, their substitutes and successors in office, and all other persons acting for or in their stead or on their behalf or by their procurement, or that of either of them" as clerks aforesaid, from performing their official duties in reference to any suit that might be brought against the complainant for a violation of the passenger or commodity rate acts, or the other acts referred to, designed to secure compliance with the passenger and commodity acts. The order for the injunction in this respect is quite extensive and elaborate, and includes a restraint upon the clerks from filing any complaint or complaints, signing or issuing any summons or other process, or placing the same in the hands of or delivering said process to sheriffs or other officers for service; and from receiving, indorsing, or filing or signing any warrant of arrest or other process of any kind under any indictment or other charge against complainant's officers and servants for the violation of any provision of any act or acts of the Legislature of Alabama passed at its regular or special session in the year 1907, or of the Code of Alabama of 1907, fixing or regulating rates for the transportation of passengers and freight.

(5) The order further restrained J. A. Chambliss and the other individuals named as sheriffs of the several counties of the state, their deputies and their successors in office, and all other executive or ministerial officers, state, county, or municipal (without naming them), empowered with authority to make arrests or to serve or execute warrants, summons, or other process, from executing or serving upon complainant or its officers or agents, and from arresting them under any summons, or summons and complaint, or other process, in any civil, penal, or "criminal suit, action or proceedings had or instituted, and from, in any manner, interfering with or molesting the complainant, or any of its agents, servants or employés, for or on account of any violation or alleged violation of any provision of any of the acts of the Legislature of Alabama" set out in the complainant's bill, or of the Code of Alabama of 1907, fixing or regulating or relative to passenger or freight rates, etc. The said sheriffs or other persons not named were also restrained from taking into their custody, or otherwise detaining, any of complainant's officers or agents, or from incarcerating them in any jail under any warrant of arrest or other process, or indictment or charge of misdemeanor, for a violation or alleged violation of any of the terms of said acts of the Legislature of Alabama, or of said Code, fixing rates between points in the state of Alabama. In other words, the said named sheriffs and other parties not named were restrained from performing any of their official duties in reference to civil or criminal suits that might be brought, based upon any violation of said statutes of the state of Alabama. The order is more extensive than is here stated, but what is said will suffice to indicate its general character.

(6) The order further restrained the members of the Railroad Commission of Alabama, and their successors in office, "from making any order, as such commission, reducing any freight or passenger rate of complainant between points in Alabama, or fixing any freight or passenger rate of complainant, or for its observance, on any of its lines in Alabama, at less than complainant's rate for the same, existing at the commencement of this suit on March 25, 1907, except as modified in the order of this court heretofore made, granting to complainant an injunction pendente lite with respect to certain articles between certain points, as specified in said order."

The order further provided that "the several acts and provisions of said Code hereinabove superseded and suspended are so superseded and suspended during the pendency of this cause and until its final determination."

The defendants, the Railroad Commission of Alabama and others, duly appealed to this court from such orders in each case, and it is assigned, with numerous specifications, that the Circuit Court erred in granting the interlocutory orders and issuing the injunctions.

Alexander M. Garber, Atty. Gen., Samuel D. Weakley, Henry C. Selheimer, and Horace Stringfellow, for appellants.

Adrian H. Joline, Hugh Nelson, Albert Rathbone, and Henry V. Poor, for appellee Central Trust Co. of New York.

George P. Harrison, Robert E. Steiner, B. P. Crum, and Leon Weil, for appellee Western Ry. of Alabama.

T. M. Cunningham, Jr., Robert E. Steiner, Lawton & Cunningham, and Steiner, Crum & Weil, for appellee Central of Georgia Ry. Co.

Henry L. Stone, Gregory L. Smith, George W. Jones, E. H. Cabaniss, Sydney J. Bowie, and J. Manly Foster, for appellees South & N. A. R. Co. and Louisville & N. R. Co.

Gregory L. Smith and Claude Waller, for appellee Nashville, C. & St. L. Ry.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge (after stating the facts as above). We assume as true and indisputable that the federal courts have jurisdiction and authority to annul and enjoin acts of a state Legislature that are confiscatory or otherwise in conflict with the Constitution; that they have no right to decline to exercise such jurisdiction when properly invoked; that every citizen, when the amount involved is sufficient and there is either diverse citizenship or a federal question involved, has the right to invoke such jurisdiction; that when such jurisdiction has attached it is exclusive, in the sense that state courts or state authority cannot interfere with it; that the process of injunction may be lawfully issued to preserve such jurisdiction from invasion by either civil or criminal proceedings; and that an injunctive suit to stay action by state officers under an unconstitutional state law is not necessarily a suit against the state. There is in our minds no doubt as to these general principles, though innumerable difficulties and disputations arise in their practical application.

Many questions are raised in these cases as to the breadth and scope of the injunctions—whether future action of the Railroad Commission can be legally enjoined; whether injunctions against clerks and sheriffs are not, in effect, injunctions against state courts; whether the effect of these injunctions is illegally to restrain action by the state grand juries; and other questions of like character. The view we take of the case makes it unnecessary to enter these inviting fields of discussion and to consider and decide these and many other questions urged on our attention.

These being appeals from interlocutory decrees granting injunctions, the ultimate question to be decided is whether or not, on the law and the facts disclosed by the record, the injunctions were im-

providently issued. The question can be intelligently decided only by considering separately the material grounds alleged as authorizing the injunctions.

1. The complainants claim that the rates are confiscatory; that they are so low as to deprive them of adequate return on their property; and that, therefore, the statutes fixing the rates are contrary to the due process clause of the fourteenth amendment and to like provisions of the state Constitution.

This contention raises a question of fact, and the main inquiry in these cases is whether or not it is sufficiently sustained by the records before us to have authorized the interlocutory injunctions.

Where it is doubtful what upon the final hearing may be ascertained to be the real facts of the case, and where the rights of the complainants are such that they will suffer no more injury if they finally succeed than would be inflicted on the defendants if unjustly enjoined, it is often the duty of the court to refuse a preliminary injunction. Especially is this true in a case where it is sought to enjoin the operation of a law fixing rates alleged to be confiscatory, when it is probable that a practical test of the law will be required to ascertain the truth. To adopt a different rule, the defendants might be unnecessarily and improperly restrained from doing what they have a right to do, and, through such restraint, suffer an injury for which they could obtain no adequate compensation. Brewer, J., observed, speaking for the Supreme Court of Kansas:

"An injunction in limine is not a matter of strict right. It may sometimes be properly refused upon the same facts which would entitle the party of right to an injunction on final hearing." Akin v. Davis, 14 Kan. 143.

See, also, by the same judge, Conley v. Fleming, 14 Kan. 381. It is true that in the event the contention of the complainants is finally sustained after a practical test of the acts, this result would show that they had unjustly suffered loss; but that only proves that laws regulating rates, like laws imposing taxes, cannot be so made and enforced as to always insure perfect equity. On the other hand, if the operation of the laws is enjoined and they afterward prove valid, some injustice has been done those entitled to the immediate benefit of the laws.

It is argued that the injunction should be issued because the rights of the defendants and all interested are secured by bonds. It is true that the courts have held that the fact that the defendants' rights may be secured by bond is sometimes a sound reason, in cases where the final result is doubtful, for exercising judicial discretion in favor of granting the preliminary injunction. But that rule is not always controlling, and clearly it should not be applied in cases where the bond does not afford adequate protection. Here the bonds given are intended to secure innumerable passengers and shippers or consignees. It is not at all probable that the claims of one-tenth of them, on breach of the bonds, would ever be presented, or, if presented, would be paid, and to enforce payment in the courts, unless those injured combined in their efforts, would cost more than the claim is worth. Those familiar with the Tift Case know that the bond proved ineffectual as

complete indemnity in that case, although the parties sought to be protected were large shippers of lumber. Tift et al. v. Southern Railway Company et al. (C. C.) 123 Fed. 789; Id., 10 Interst. Com. R. 548; Id. (C. C.) 138 Fed. 753; Southern Railway Company et al. v. Tift et al. (C. C. A.) 148 Fed. 1021; Id., 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124; Tift et al. v. Southern Railway Company et al. (C. C.) 159 Fed. 555. Where the injunction is granted, the bonds should, of course, be required, but the court cannot safely exercise its discretion upon the theory that the bond in a case like this gives complete indemnity.

It is urged by the complainants that the temporary injunction was properly issued because required to protect their property rights. That contention assumes a disputed assertion to be true. If no one else was concerned, the courts might yield to that view without much hesitation. But the passengers and shippers, if, strictly speaking, they have no property interest involved, have a pecuniary interest in the enforcement of the rate laws. So there are rights on both sides deserving careful thought. And the public has an interest in the enforcement of every law until it is repealed or judicially annulled. The courts should, of course, with strong hand protect property from all unlawful invasion, but they should not be so engrossed by that thought and duty as to forget the rights of others, whether property rights or not. We would be slow to hold that any man or corporation was entitled to the immediate enforcement of an alleged right inconsistent with the rights of others.

The litigation is likely to end sooner if no injunction is in force. Its dispatch is greatly dependent upon the conduct of the case by the complainants. They would not be inclined to press the case for speedy decision when they have once secured a preliminary injunction. As long as it stands, it is as good as any other, and experience shows that it often has practically the effect of a permanent injunction. Knowledge of this fact was probably one of the causes for the enactment of the statute allowing appeals from these interlocutory orders. Act April 14, 1906, c. 1627, 34 Stat. 116. In these cases the preliminary injunctions have been in force for two years. If no injunction had been granted, it is probable that a final decree of the Circuit Court would have been reached in one-fourth of that time.

There is no statute allowing an appeal from the Circuit Court to the Supreme Court from an interlocutory order granting an injunction. We have, therefore, as to the cases at bar, no controlling authority directly in point. Two recent cases, however, indicate the views of that court on the questions involved here.

In Wilcox v. Consolidated Gas Company of New York (decided January 4, 1909), 29 Sup. Ct. 192, 53 L. Ed. ——, the bill was filed to enjoin the enforcement of certain acts of the New York Legislature alleged to be unconstitutional because the rates fixed by the act (prices to be charged for gas) were confiscatory. The court, in refusing to grant the relief prayed for, made observations that throw light on the measure of proof required in such cases: "We cannot say there is no fair or just doubt about the truth of the allegation that the rates are insufficient." And the court suggested that "there may be other

cases where the evidence as to the probable result of the rates in controversy would show that they were so nearly adequate that nothing but a practical test could satisfy the doubt as to their sufficiency." And it was further said "that a reduction in rates will not always reduce the net earnings, but, on the contrary, may increase them." The court dismissed the bill in that case, repeating the rule as to the measure of proof required, holding that the complainant had not shown "beyond any just or fair doubt that the acts of the Legislature of the state of New York are in fact confiscatory." In the order of reversal dismissing the bill without prejudice, the court said:

"It may possibly be, however, that a practical experience of the effect of the acts by actual operation under them might prevent the complainant from obtaining a fair return, as already described, and in that event complainant ought to have the opportunity of again presenting its case to the court."

The opinion in that case is very instructive as to the strict rule of evidence applicable to such cases, and the importance the court places on a test by actual trial before coming to the conclusion that an act in question is confiscatory. It appears from the statement of the case made by Mr. Justice Peckham, who delivered the opinion, that a preliminary injunction was issued by the Circuit Court, the cause referred to a master, who reported in favor of the complainant, and the Circuit Court confirmed the report. After such elaborate investigation, the Supreme Court indicated in its opinion the importance of a practical test by an actual trial of the statute. It would clearly have been the better course in that case for the Circuit Court to have refused the preliminary injunction and let the test be made at first.

The case of Mayor and Alderman of the City of Knoxville v. Knoxville Water Company (decided January 4, 1909) 29 Sup. Ct. 148, 53 L. Ed. ——, was brought by a bill to enjoin an ordinance fixing maximum rates to be charged by the company. It was alleged that the ordinance was confiscatory, the rates being fixed too low. The complainant, after reference to a master, report, and confirmation, was granted relief by the lower court, and the injunction was made permanent. The court, speaking by Mr. Justice Moody, quoting earlier cases, said:

"In the first place, no injunction ought to be granted unless in a case reasonably free from doubt. We think such rule is, and will be, followed by all the judges of the federal courts. * * * Judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use."

The court laid stress on the fact that the case did not rest on "observation of the actual operation under the ordinance."

Again, showing the importance the Supreme Court attaches to the experience had by the actual operation of an ordinance or statute fixing rates, it should be noted that in reversing the decree and in dismissing the bill it was done without prejudice, so that, if it appeared by a test that the ordinance was in fact confiscatory, the suit could be renewed. It seems from an attentive examination of the opinion in the case that the better course for the Circuit Court to have

taken in the Knoxville Water Company Case would have been to have permitted the practical trial of the ordinance before issuing the preliminary injunction.    See, also, Cumberland Tel. & Tel. Co. v. Railroad Commission (C. C.) 156 Fed. 834, refusing temporary restraining order, and the same case, on final hearing, granting an injunction; also the same case, decided by the Supreme Court, February 23, 1909, reversing the order granting the injunction, 29 Sup. Ct. 357, 53 L. Ed. ——.

In Central of Georgia Railway Company v. McLendon et al. (C. C.) 157 Fed. 961, 978, after an order was made at chambers by a Circuit Judge denying a temporary restraining order ([C. C.] 155 Fed. 975), the case came on for hearing on a motion to grant a temporary injunction.    Judge Newman, who heard the motion, declined to grant the temporary injunction, holding that the rate claimed to be confiscatory should be tried to ascertain its effect upon the railway company's business.    The practice pursued by Judge Newman in that case, we think, is to be commended.

The records before us consist mostly of affidavits giving opinions relating to schedules, rates, values, and various involved and intricate facts.    There has been no opportunity to cross-examine the affiants—a time-honored means of ascertaining the truth.    The statutes enjoined have not been permitted to be in force one day.    There has been no practical test of the rates by observation of their effect.    We have not before us even the result of the trial of rates nearly like these by the several Alabama railroads which are not contesting but obeying these laws.    There has been no reference to a master, deliberate investigation by him, and formal report and confirmatory decree.    After such deliberate and careful contradictory trial, the courts, as we have seen, have sometimes held that the validity of the statute as to the confiscatory question could only be settled by the practical test of its actual trial.

The several records, as presented in this court, contain about 4,000 closely printed pages.    We have not attempted to quote it or condense it, and have only dealt with it by indicating our conclusions after an attentive consideration.    Ordinarily, in a bill seeking an injunction and in the affidavits filed in support of it, we find statements of fact based on knowledge.    These bills are filed to enjoin rates that have never gone into effect, and are necessarily based mostly on opinions or suppositions.    The ultimate fact sought to be placed before the court is what per cent., if any, of net earnings would accrue to the complainants respectively on the value of their property used in intrastate business if the rates enjoined were enforced.    The answer must depend on the actual value of the property devoted to the intrastate business, and the net amount that would be earned on the intrastate business if the rate enjoined was in operation; this, of course, depending on the amount of gross revenue from such business and the actual expense of conducting it.    Take it for granted, for instance—which is not at all clear—that by opinions of experts the value of the property is ascertained, and that the cost of doing $100 worth of such business is ascertained with reasonable certainty, so that the net gain is made plain; there is left an element of uncertainty that is

not answered by a reference to last year's profits, to wit, the amount of business that would be done under the lower rates, and this nothing but a practical test would show. "May it not be possible—indeed, does not all experience suggest the probability—that a reduction of rates will increase the amount of business, and, therefore, the earnings?" Chicago & G. T. Railway Company v. Wellman, 143 U. S. 339, 343, 12 Sup. Ct. 400, 36 L. Ed. 176.

Our attention is called to the numerous decisions of this court refusing to reverse interlocutory decrees granting injunctions pendente lite, and announcing that the making of such decrees was within the sound judicial discretion of the lower court, and that it would not be interfered with unless violative of some rule of equity procedure, and unless, under all the circumstances, the injunction was improvidently granted. Lehman v. Graham, 135 Fed. 39, 67 C. C. A. 513, and cases there cited. Such is the general rule that has been announced in ordinary suits between parties so situated that the rights of the defendant could be fully protected by bond in case the injunction on the final hearing was dissolved. It has never been applied by this court in a case where the situation was such that the rights of the defendants or others having interests could not be so protected, where the defendants were restrained from the exercise of a right conferred by a statute which was prima facie valid, and where the granting of the injunction would prevent a practical test that would probably be necessary before the case could be fairly and finally decided. Clearly, this rule should not control in a case like this, where the purpose is to arrest the operation of a law on the ground that it is confiscatory and, therefore, void. It is a rule in equity in ordinary cases that the master's findings approved by the lower court must be treated as unassailable so far as it depends upon conflicting testimony, or upon the credibility of witnesses, or so far as there is any evidence consistent with the findings. Davis v. Schwartz, 155 U. S. 631, 636, 15 Sup. Ct. 237, 39 L. Ed. 289. But the Supreme Court held that the established rule was not applicable to a case where the complainants sought to enjoin an ordinance as confiscatory. "This court," said Mr. Justice Moody, "will not fetter its discretion or judgment by an artificial rule as to the weight of the master's findings, however useful and well settled these rules may be in ordinary litigation." Knoxville v. Knoxville Water Company, supra. We think that on appeals from orders annulling statutes which are prima facie valid, their invalidity depending on facts to be proved, it is the duty of the appellate court—and a responsibility which it cannot avoid—to examine the whole case on the law and the facts. We do not mean to say that the decision of the lower court is not entitled to great weight, or that, as a practical question, it may not sometimes be treated as conclusive. But where the usual result of an interlocutory injunction is to enjoin the operation of the law for a long period, and where the dissolution of the injunction is the only means of obtaining a practical test, which may at last be necessary, the ends of justice will be promoted by an examination of the merits by the appellate court.

Cases, of course, may occur where the rates are apparently so flagrantly unjust, so in conflict with experience and common knowledge

as to what is right, as to seem unfair and probably confiscatory on their face. In such instances, it may be that the sworn bill, with proper averments and with the affidavits of experts as to their opinions, would be sufficient to overcome the prima facie presumption that the rates established by legal authority are valid. But where the rates are not manifestly unfair, where it may be that in their practical enforcement they may not greatly lessen the income and may possibly increase it, it seems to us unreasonable that the law should be suspended on such procedure. Take, for illustration, the passenger rates of 2½ cents per mile established by the acts in question here. The rate before the act was 3 cents. Whatever the final trial may show, the change does not seem to us so unreasonable that the presumption of its validity should be overcome without the test of its practical trial, or, at least, without the safeguards of an investigation in equity that usually precedes a final decree. Such statutes, not apparently extreme or unjust, should not, in our opinion, be suspended at all on ex parte opinion affidavits. The courts cannot as a rule yield their right of judgment to the opinions of interested experts who are not even subjected to cross-examination. If they did so, in railroad law the regulation of rates would become obsolete, and in criminal law murder would cease to be a punishable crime.

We cannot refrain from quoting, in conclusion, the wise and conservative words of Mr. Justice Moody, speaking for the Supreme Court in the case of Knoxville v. Knoxville Water Company, supra:

"The courts, in clear cases, ought not to hesitate to arrest the operation of a confiscatory law, but they ought to refrain from interfering in cases of any other kind. Regulation of public service corporations, which perform their duties under conditions of necessary monopoly, will occur with greater and greater frequency as time goes on. It is a delicate and dangerous function, and ought to be exercised with a keen sense of justice on the part of the regulating body, met by a frank disclosure on the part of the company to be regulated. The courts ought not to bear the whole burden of saving property from confiscation, though they will not be found wanting where the proof is clear. The Legislatures and subordinate bodies, to whom the legislative power has been delegated, ought to do their part. Our social system rests largely upon the sanctity of private property, and that state or community which seeks to invade it will soon discover the error in the disaster which follows. The slight gain to the consumer which he would obtain from a reduction in the rates charged by public service corporations is as nothing compared with his share in the ruin which would be brought about by denying to private property its just reward, thus unsettling values and destroying confidence. On the other hand, the companies to be regulated will find it to their lasting interest to furnish freely the information upon which a just regulation can be based."

2. It is claimed that the statutes in question are contrary to the provisions of the Alabama Constitution.

Section 44 of the Constitution of 1901 of Alabama provides that:

"The legislative power of this state shall be vested in a Legislature, which shall consist of a Senate and a House of Representatives."

Section 243 provides that:

"The power and authority of regulating railroad freight and passenger tariffs, the locating and building of passenger and freight depots, correcting abuses, preventing unjust discrimination and extortion and requiring reasonable and just rates of freight and passenger tariffs, are hereby conferred upon the Legislature, whose duty it shall be to pass laws from time to time regu-

lating freight and passenger tariffs, to prohibit unjust discrimination on the various railroads, canals, and rivers of the state, and to prohibit the charging of other than just and reasonable rates and enforce the same by adequate penalties."

The first section of the act of August 9, 1907, is as follows:

"That in all cases where any classification of railroads or of any articles of freight or any maximum rates or charges for the transportation of passengers or freight over any railroad in this state have been, or may hereafter be, prescribed by statute, or any prevailing rates or charges for such transportation have been, or may hereafter be, by statute made the maximum rates or charges, the Railroad Commission of Alabama shall have the power and is hereby authorized to change such classifications and such rates or charges, or any of them, from time to time as conditions may, in its judgment, render it expedient or proper so to do, whether the effect of such change be to increase or to reduce any of such rates or charges, and to establish and order to be put in force in lieu thereof any new classification or rate or charge which it may deem reasonable and proper, and the classifications, rates or charges so established by it shall be the lawful classifications, rates or charges until further changed by said Railroad Commission." Gen. Acts Ala. 1907, p. 711.

There are similar provisions in the acts known as the "Eight Group Acts." Gen. Acts Ala. Sp. Sess. 1907, pp. 91, 101, 109, 117, 125, 133, 143, 153.

It is contended by the appellees that these statutes which authorize the Railroad Commission to fix and change rates are void as an attempt to delegate to the commission legislative power over rates.

It is a familiar principle that a grant of legislative power to do a certain thing carries with it the power to use all proper and necessary means to do it.

The Legislature in Alabama, under the Constitution, has regular sessions every 4 years, which are to continue only 50 days. It would not be possible, without the introduction of a commission or some other agency, for it to properly exercise the power of regulating rates conferred on it by the state Constitution. It is true that the function of fixing rates is legislative in its nature, yet it seems well settled now that the creation of a commission, with power to fix rates, is not an unconstitutional delegation of legislative power. It was held in Georgia, where the constitutional provision is similar to the one quoted from the Alabama Constitution, that, although the Legislature itself could fix the rates, it was competent to avail itself of a Railroad Commission and to confer on it the authority to prescribe and change rates from time to time as a changed condition might justify or require. Georgia Railroad et al. v. Smith et al., 70 Ga. 694; Chicago, B. & Q. R. R. Co. v. Jones, 149 Ill. 361, 37 N. E. 247, 24 L. R. A. 141, 41 Am. St. Rep. 278; Chicago & N. W. Ry. Co. v. Dey et al. (C. C.) 35 Fed. 866, 1 L. R. A. 744. There are numerous authorities to the same effect which we do not cite, for we understand that, to this extent, counsel on both sides are agreed. The contention of the complainants is that, the Legislature having prescribed rates, or maximum rates, it could not by previous or subsequent statutes authorize the Railroad Commission to change them. It is not denied that the Legislature could confer on the commission the power to fix the rates, or that the Legislature could, if it chose, when practicable, fix them itself. The contention is that, when once fixed by legislative enact-

ment, power cannot be conferred on the commission to change or repeal the law. That may be conceded to be true as a general proposition. If the Legislature were to fix the rates as permanent rates, without in the same or some previous act conferring authority on the commission to regulate or change them, the rates could only be changed or repealed by the Legislature itself. But, looking at the acts in question and the other legislation relating to this subject, it is plain that the Legislature has not intended, and did not fix, the rates as permanent rates. It was not intended to fix rates to last four years—from one meeting of the Legislature to another. The intention was—and the statutes, we think, show it—that rates were stated in the act to stand till conditions made it expedient and proper for the commission to change them. Looking at the system of laws on this subject, the intent of the lawmakers is clear. But, aside from that, we find in the letter of the law sentences pointing the same way. Rates are prescribed "until otherwise provided by order of the Railroad Commission." The commission, from the time of its creation, had the power to reduce rates, and, when the Legislature fixed maximum or other rates, it knew of this power of the commission, and did not repeal it. We think the Legislature had the power to confer the authority in question on the commission. Saratoga Springs v. Saratoga Gas, etc., Co., 191 N. Y. 123, 83 N. E. 693. Whether established directly by legislative action or by the commission, the rates are always subject to the limitations of both the state and federal Constitutions. To hold that the Legislature could not confer on the commission the power in question would either deprive the Legislature of the right to make rates by direct act, or deprive the commission of the power to regulate them. This would not be sound, for, as a question of power, they may be regulated by either the Legislature or the commission.

We regret that the Supreme Court of Alabama has not had occasion to pass on the question of the constitutionality of these statutes. Its construction of the Constitution and statutes of that state would be followed by this court. In advance of a decision by the Supreme Court of Alabama to that effect, we would be very reluctant to strike down the acts as void. Every statute is presumed to be constitutional until the contrary is made clearly to appear. When there is a doubt as to the validity of a statute, the expressed will of the Legislature should be upheld.

We have carefully examined the case of Mitchell v. State ex rel. Florence Dispensary, 134 Ala. 392, 32 South. 687, and we do not think it controlling or even applicable here. That it is not applicable, we think, is shown by other and later cases decided by the same court. Ward v. State ex rel. Parker (Ala.) 45 South. 655; Tallassee Falls Mfg. Company v. Commissioners' Court (Ala.) 48 South. 354.

We do not think the statutes in question are void as conferring on the commission legislative power in violation of the Alabama Constitution.

It was claimed in argument that the statutes fixing rates were void because of provisions or separate statutes fixing severe penalties. The provisions imposing penalties may or may not be void. That

question is not here for decision, and we intimate no opinion on the subject. They are not a necessary and inseparable part of the acts, without which they would not have been passed. The validity of the rates is not dependent on the question of the validity of the provision imposing penalties. Willcox v. Consolidated Gas Company of New York, supra. If the complainants obey the laws until they are repealed or declared void by judicial authority, it may not be necessary to decide questions raised as to the penalties.

Each of the decrees appealed from is reversed and annulled, the injunction or injunctions issued on each decree is dissolved, and each cause is remanded to the Circuit Court for further proceedings in conformity with the opinion of this Court.

In each case it is so ordered.

PARDEE, Circuit Judge (dissenting). In my opinion the statutes of the state of Alabama, conferring power upon the Alabama Railroad Commission to fix and adjust rates, are constitutional, and, therefore, I think that the orders of injunction appealed from, restraining the commission in respect to making other and future rates, except within certain limits defined by the court, are erroneous, and should, in that respect, be modified.

A painstaking examination of the transcripts satisfies me that the complainants made sufficient proof as to the confiscatory nature of the rates sought to be enjoined, and that they are entitled to the protection of the court pending a final hearing; and, therefore, in my opinion, the injunction orders appealed from, except as to future rates, should be affirmed.