DARNELL v. EDWARDS et al.

(District Court, S. D. Mississippi. November, 1913.)

No. 9.

1. CARRIERS (§ 12*)—STATE REGULATION OF RATES—CONFISCATORY RATES.

In determining whether a freight rate established for a railroad by a state commission is unconstitutional as confiscatory, the only question is whether it will yield a fair return on the value of the property employed.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

2. CARRIERS (§ 18*)—STATE REGULATION OF RATES—SUIT TO ENJOIN ENFORCEMENT.

A preliminary injunction to restrain the putting in force by a state commission of a rate on logs to be charged by a railroad doing principally a logging business, on the ground that such rate is confiscatory, denied on the showing made, and where it appeared that the lumber company shipping most of the logs was under practically the same ownership as the railroad.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

In Equity. Suit by R. J. Darnell against George R. Edwards and others, composing the Railroad Commission of Mississippi. On motion for preliminary injunction. Denied.

Montgomery & Montgomery, of Tunica, Miss., for complainant.

George H. Etheridge, Asst. Atty. Gen., and Woods & Kuykendall, of Charleston, Miss. (James Stone, of Oxford, Miss., on the brief), for defendants.

Before SHELBY, Circuit Judge, and NILES and GRUBB, District Judges.

PER CURIAM. This is an application by the complainant for an injunction pendente lite to restrain the Railroad Commission of Mississippi from putting into effect a rate on logs over a railroad leased to and operated by the complainant, and which ran from Batesville, a station upon the railroad of the Illinois Central Railroad Company, in the state of Mississippi, southwesterly, a distance of about 17 miles. The complainant assails the rate made by the commission as being confiscatory and in violation of the fourteenth amendment to the Constitution of the United States. The question for determination is whether Darnell, lessee and operator of the Batesville & Southwestern Railroad, will receive a fair return on the reasonable value of the property devoted to public use, if the Railroad Commission's rates on logs are made effective.

The bill shows that the railroad earned for the fiscal year, ending June 30, 1913, $15,553.01, and that the operating expense for the same year was $4,296.20, leaving net earnings of $11,256.81. Against these the plaintiff charges one-twentieth of the amount alleged to have been expended by him in construction, $163,467.67, as annual rent, upon the erroneous idea that it was a proper rental charge and operating expense. After deducting this rental charge, there is left the sum of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

$3,123.42, which is 1.92 per cent. on the sum so expended by the complainant, instead of 6 per cent. on that sum, or $9,760.06, which complainant contends he should have. These figures are based on the plaintiff's own rates.

[1] As we see it, the question should be solved without reference to the question of interest plaintiff has in the railroad or the reimbursement to him of the amount expended by him in construction. The bill shows a net operating income of $11,256.81, and the remaining inquiry is, "Is this a fair return on the property (i. e., railroad and equipment) employed in the earning of it?" This depends upon what the property, so employed, consists of and the value of it.

The railroad was built at the joint expense of the Illinois Central Railroad Company and the plaintiff. The affidavit of Elliott Lang shows that plaintiff expended $163,467.67 for construction and equipment. There is nothing to show how much was expended by the Illinois Central for the part it did, viz., furnishing track material, driving piles, etc. The record shows that the Illinois Central, under its contract with plaintiff, has repaid to plaintiff the sum of $69,500 of the sum expended by him. This is all the evidence contained in the record relating to the original cost or the present value of the property devoted to the public use. The amount of plaintiff's expenditure, as stated, is disputed by defendants. In any event, the item of $12,-687.04, designated "other expenditures," should be eliminated until the nature of this expenditure is made to appear. This would leave the amount claimed to have been so expended approximately $150,-000, or about $10,000 a mile, for the cost of preparing the roadbed and laying track, not including the cost of pile driving and of track material and equipping the road. In view of the character of the road and its territory, as developed by the evidence, this would seem ample for the whole work of construction. In any event, the plaintiff is not in a position to contend for more, since the record fails to show any other or greater expenditure by any one. The net earnings for 1912, eliminating the improper rental charge, would yield approximately 7½ per cent. upon the plaintiff's corrected valuation of $150,000. These earnings are the result of plaintiff's own rate on logs. If the commission's rates were substituted for the plaintiff's for the year 1912, and if no more business had been done for that year than was done under those rates, and if all business done for that year was the handling of logs (and this seems to have substantially been the case), the gross earnings would be reduced from $15,553.01 to approximately $8,000, and, deducting operating expenses ($4,298.20), the net operating income would be approximately $3,700. No showing is made on the record for taxes. This would be about 2½ per cent. on the assumed valuation of $150,000. The affidavits, however, tend to show that the voluntary rates of the plaintiff are prohibitive on all shippers, upon the shipment of all classes of logs, except only hickory and white oak, and practically forbid the transportation of all classes of logs, except when cut from the lands of the plaintiff and shipped by his lumber company. The contention of the commission is that plaintiff can afford to pay any rate, since there is a practical identity of interest be-

tween plaintiff, as lessee of the railroad, and plaintiff's incorporation as owner and shipper of the logs, so that the freight money would be taken by him from one pocket and put by him into the other.

The record shows that the Illinois Central Railroad Company voluntarily maintains rates on logs from Walls and Arden, stations on its line, to Memphis, for like distance of 15 miles, substantially the same in amount as those fixed by the Railroad Commission for plaintiff's railroad. The comparative rates on logs on other railroads in various sections of the United States, as shown by Exhibit I to the bill, are higher, but conditions on those roads are not shown to be similar. No inference unfavorable to the commission rates can therefore be drawn from the comparison.

If the commission rates, when enforced, will yield the plaintiff no more than 2½ per cent. on his investment, it would seem that they are too low. The fact that they would have yielded only that amount on the amount of business actually handled in 1912 under plaintiff's voluntary rates is, however, not conclusive. The defendant's contention that these rates were prohibitive as against all shippers except plaintiff or his incorporation, and that other timber landowners would cut and ship logs under the Railroad Commission's rates, if they had a chance under reduced rates, and would so greatly increase the volume of business transported as to make it remunerative under the lower rates, seems plausible. At least, it cannot be said in advance of a period of experiment under the lower rates that such would not be the case. If no business was developed by the lower rates, then, if the plaintiff is, as alleged, the party most interested in the incorporation that has heretofore cut and shipped the logs, no harm would be done plaintiff, since what he lost in operating the railroad he would regain in the additional profit on the logging business, due to reduced rates. The interest of the plaintiff in both the logging business and the railroad also impairs the value of the usual inference that the operator of the railroad would so operate it as to develop all the business that could be developed, and would make the greatest profit possible. It is clear that the interest of the plaintiff in the railroad may be counterbalanced by his interest in the timber, if it was built to develop the timber that he already owned, and that which he may yet desire to acquire at lower figures, obtainable because of its inaccessibility to proper railroad facilities and rates. So it is true that the amount actually expended by plaintiff to build the railroad in this instance may be no true index of its fair value, since his timber interests may have induced him to build a railroad that could not be expected to be operated profitably as a purely transportation proposition.

[2] It at least seems to us that it would be better not to interfere with the commission-made rates until final hearing, as this would afford a period for experiment as to their power to develop new business in volume sufficient to make the commission rates remunerative, and in view of the fact, if they fail to develop any new business, the loss of revenue to plaintiff from the enforcement of the reduced rates will be partly reimbursed to him in the additional profit, due to the reduced rates the incorporation, which does the logging and shipping,

and in which he seems to be largely interested, will make on its product. Railroad Commission of Alabama v. Central of Georgia Railway Co., 170 Fed. 225, 95 C. C. A. 117.

Additional gross earnings of about $5,000, with the same operating expense, would produce a net return of 6 per cent. upon the present showing upon the valuation of $150,000 for the equipped railroad. The unrebutted affidavits tend to show that the additional business could be transported without any additional train crews than those heretofore employed, and at small additional operating expense.

We think there is no such showing of confiscation as is required by the rate case of Simpson v. Shepard, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, and the other rate cases recently decided by the Supreme Court, to justify the court's interference with the state-made rates, at least upon the motion for a temporary injunction; and the application for the injunction pendente lite is denied.