## WILLIAM BERDAN et al.

### *v.*

## PASSAIC VALLEY SEWERAGE COMMISSIONERS.

[Submitted August 12th, 1913. Decided August 20th, 1913.]

1. *P. L. 1907 p. 22,* authorizing the municipalities in the Passaic valley sewerage district, created by *P. L. 1902 p. 190,* or any of them, to determine the advisability of constructing an intercepting or trunk sewer for the disposal of the sewage of the valley at a safe and proper place, and, having resolved so to do, to prepare maps, plans and specifications for the construction of a joint trunk or main sewer, &c., did not confer on the sewerage commission discretion to choose the type, manner of build-

ing, or location of the sewer, conferring on it only the power to suggest and prepare plans and prospectus, leaving the determination of the type of sewer, manner of building, location, &c., to the constructing municipalities.

2. Equity may not, at the instance of taxpayers, enjoin the Passaic Valley Sewerage Commissioners from constructing a part of a trunk sewer and pressure tunnel leading to an outlet in New York bay, where such tunnel had been adopted as a part of a plan by the various municipalities for the drainage of the sewer district, after long and careful study of the problem, on the ground that the sewage effluent to be carried might be safely deposited in Newark bay at a saving of a large sum.

3. A court of equity may not interfere by injunction to restrain municipalities and subordinate bodies from an abuse of discretion lodged in them by the legislature, in the absence of special equities calling for such intervention; the review of such acts, except in cases where peculiar and extraordinary rights are affected, being within the jurisdiction of the supreme court.

4. A preliminary injunction may not be granted to restrain a portion of a public improvement authorized by statute on the ground that the statute is unconstitutional, where the constitutional question is doubtful.

5. Where taxpayers sued the board of sewerage commissioners to restrain the construction of a pressure tunnel, part of the Passaic valley sewer, constructed under authority conferred on certain municipalities by *P. L. 1907 p. 22*, the municipalities were necessary parties to the suit.

On motion for preliminary injunction. On bill, affidavits and order to show cause.

*Mr. Warren Dixon,* for the motion.

*Mr. Adrian Riker* and *Mr. John R. Hardin, contra.*

BACKES, V. C.

This bill is filed by eight taxpayers of the city of Paterson, and prays an injunction restraining the Passaic Valley Sewerage Commissioners, a body corporate, from constructing, as a part of the Passaic trunk sewer system, a pressure tunnel eastward of Newark bay to Robbins reef, in New York bay, on the ground that the sewage effluent to be carried by it may be safely deposited in Newark bay, and this at a saving of $6,000,000, and hence, that the contemplated expenditure for the building of the tunnel is an abuse of discretion reposed in the sewerage commission by the legislature. The reclaiming of the Passaic

river, and the disposal of the sewage of the Passaic valley, have commanded the attention of the courts and of the legislature for years. The history is interesting but not of special moment at this time. By the legislative scheme of 1907 (*P. L. 1907 p. 22*) the municipalities in the Passaic valley sewerage district (*P. L. 1902 p. 190*), or any one of them, were authorized to determine the advisability of constructing an intercepting or trunk sewer, for the disposal of the sewage of the valley at "a safe and proper place," and, upon such determination being resolved, to require the sewerage commission to prepare maps, plans and specifications for the construction of a joint trunk or main intercepting sewer or sewers and all the necessary works for the discharge and disposal of sewage and other polluting matter "at some safe and proper place or places," together with an estimate of the probable cost of such construction and of the operation and maintenance, &c., and to submit copies to all of the municipalities. Any two or more were thereupon authorized to contract with each other, and they collectively with the sewerage commission, to construct and maintain and operate a sewer system to intercept and carry the sewage of the contracting municipalities according to the said maps, plans and specifications so submitted, or as modified by them. The sewerage commission was to build and operate the sewers, and the municipalities were to furnish the means. Upon the requisition of Newark and Belleville maps, plans and specifications were prepared and copies submitted for a trunk sewer down the course, practically, of the Passaic river from Paterson to purification works on the Newark meadows, and a pressure tunnel across Newark bay to Robbins reef, in New York bay, with an outfall forty feet below mean low water; including purification works and pumping station on the Newark meadows. On May 15th, 1911, a contract was entered into by fifteen of the twenty municipalities in the valley, by which they agreed to build a sewer according to the said maps, plans and specifications, and to share their respective proportions of the cost of construction and maintenance, wherein the sewerage commission joined as the principal contracting party, to build and operate the sewer. The sewerage commission has already expended upwards of $400,000, and has

bound itself by contracts to the extent of more than three millions of dollars in the building of the sewer. Inasmuch as these outlays and undertakings concern portions of the sewer which will have to be built regardless of the site of the terminal, they do not enter into the consideration of the proposed 'expenditure for the building of the pressure tunnel.

Nowhere in the statute can there be found an intent to confer upon the sewerage commission discretion to choose the type, manner of building, or location of the sewer. This the act leaves finally to the contracting municipalities. The sewerage commission may suggest. Its duties are to prepare the prospectus, to be accepted, rejected or modified at the will of the municipalities, and upon adoption and contract made, its powers are restricted to the construction of the sewer according to the terms of the contract, to be exercised in the manner prescribed by the statute. The sewerage commission is merely an instrumentality, afforded by the legislature, by which the municipalities are enabled to carry out the project outlined, and in a measure defined by the statute; and so it is apparent that the complainants' attack upon the abuse of discretion by the sewerage commission is misconceived. However, I will deal with the merits of the case as though the charge of abuse of discretion had also been leveled at the municipalities, and they were made parties to the suit.

The bill does not challenge the legality of the contract; but a collateral matter is introduced as evincing, and from it, it is claimed should be deduced that the pressure tunnel is an unnecessary appendix to the sewer system. The original plan was to empty the sewage, natural. After the prospectus was prepared and copies submitted, the State of New York filed a bill in the United States supreme court to prevent the discharge in New York bay, in which action the United States intervened. This suit is still pending. A compromise was reached with the government and it withdrew from the suit upon an agreement being entered into by the sewerage commission on April 14th, 1910 (*P. L. 1910 p. 267*), wherein it was stipulated that the sewage should be first submitted to treatment, so that the effluent when deposited in the waters of the bay would be in such a

state of purity as to result in an absence of (*a*) visible suspended particles; (*b*) deposits objectionable to the secretary of war; (*c*) odors due to putrefaction of organic matter; (*d*) practically, of grease or color on the surface of the water; (*e*) injurious effect upon the property of the United States in the water of New York; (*f*) the reduction in the dissolved oxygen content of the water of New York bay to such an extent as to interfere with major fish life, and (*g*) that there will be no injury to the public health and no public or private nuisance created thereby. Contemplating a fulfillment of the agreement, and advised by the then admitted leader in this country in the science of sewage disposal, that by a process of screening and sedimentation, the results stipulated could be attained, the plans and specifications were modified to meet the new conditions and the municipalities entered into the contract to build the sewer.

The contention of the complainants is that an effluent of the quality required by the agreement with the government would be so innocuous as to be deliverable in Newark bay without risk of corruption, and in fact really beneficial to the waters of the bay; or, in the alternative, that the sedimentation system adopted by the sewerage commission will not produce the effluent as stipulated; and as a corollary, in either event, that the cost of carrying it further and into New York bay would be an unwarranted and inexcusable waste of public funds.

Considerable opinion testimony—*pro* and *con* these propositions of gentlemen of high esteem in the sewerage art has been submitted, some of which was given with ingenious reservations of pertinent facts and convictions—verily, a battle of experts. After a careful consideration of the proofs, it is enough to say, in disposing of this phase of the case, that they do not satisfy me that an effluent of the degree of clarity and purity to be non-defiling to the water of Newark bay is necessary to meet the criterion of the stipulation with the government. It is perfectly obvious, even to the lay mind, that New York bay, because of its great depth and dilution volume, constantly agitated by strong tides and currents of great velocity, is possessed of far greater absorbing and digesting capacity and of oxidizing and mineralizing properties than the shallow and sluggish waters of

Newark bay. And it is to be assumed that the distinguished scientist, who was then in the employ of the sewerage commission, and who is now championing the complainants' cause, in advising the sewerage commission of the feasibility of its undertaking with the government, did so with a full and comprehensive appreciation of the inutility of the waters of Newark bay; and, as I understand his evidence, he does not recede from the position he then took, although he now advocates a more modern process, known as the "Imhoff Septic Tank," perfected since the compact with the government was made, which, it is claimed, will insure a purity of effluent permissible in Newark bay, and which he says is the effluent he had in mind when he deposed in his affidavit to the bill, that treated sewage could, with propriety, be there disposed of. Furthermore, his present view seems to be, as it probably was at the time he counseled the sewerage commission that sewage treated with the screening and sedimentation process could safely be deposited in Newark bay only at its lower reaches, near the Kill von Kull, where, because of the depth of the waters, strong currents and high percentage of dissolved oxygen content, the absorptive and digestive agencies are equal, if not greater, than those of the waters of New York bay. To adopt either of the suggested courses would not result in a saving. The installation and maintenance of the Imhoff tanks, one or more of which would be needed in each community, would involve an outlay equal to, or in excess of, the cost of the tunnel. To submit the sewage to the more elaborate treatment would necessitate the construction and operation of broad areas of sprinkling filters, which have their disadvantages in likely malodorous nuisances in the immediate neighborhood of their location. The distance to the lower end of Newark bay is about the same as that to Robbins reef.

The opinions of four savants, in support of the complainants' contention, are aligned against the judgment of four experts of equal renown who projected this entire sewerage scheme, and under whose guidance the sewerage commission has acted from the inception of the works, and upon whom it relied in making the agreement with the government. Conceding an equality of ability, plus the practical experience in the enterprise, it seems

to me that the views of the active engineers, upon the mooted question, is of more weight and reliance than the opinions of those who were drafted into this case simply to support the litigated point.    Moreover, I am inclined to regard the reasons which actuated the opinions of the complainants' experts as hypercritical.    The standard of the effluent, upon which they evidently predicated their views, is that of a laboratory test, and they apparently altogether ignored the cause which moved the government to interfere, as well as the circumstance that the fulfillment of the agreement with the government is to be considered in connection with the degree of efficiency of the sedimentation works, as shown by the plans and specifications which the government's officials approved, and from which the fair implications arise that the government deemed the method as adequate, and that the character of the effluent was to be measured by practical results, which would not endanger navigation nor create nuisances to the detriment of the property rights of the United States.    There is obviously a very wide path between the effect of sewage effluent deposited in the ocean highways and when disposed of in inland waterways.    That the sewerage commission and the municipalities adopted a higher factor of safety than is approved by the complainants is not a ground for equitable interference with the discretion vested in them by the legislature.    Moral obliquity is not involved.    That the sewage commission formed its decision only after a long, industrious and careful study of the problem, and that it acted wisely and judiciously amply appears by the proofs:

"No principle of equity jurisprudence is better established than that courts of equity will not sit in review of the proceedings of subordinate, political or municipal tribunals, and that where matters are left to the discretion of such bodies, the exercise of that discretion in good faith is conclusive, and will not, in the absence of fraud, be disturbed.    And the fact that the court would have exercised the discretion in a different manner will not warrant it in departure from the rule.    *High Inj.* § *1240.*

This principle has been often applied and exploited by the courts of this state.    *Plum* v. *Morris, &c., Canal Co., 10 N. J. Eq. (2 Stock.) 256; Allen* v. *Board of Chosen Freeholders, 13 N.*

16

*J. Eq.* (*2 Beas.*) *68; Pope* v. *Town of Union, 18 N. J. Eq.* (*3 C. E. Gr.*) *282; Bond* v. *Newark, 19 N. J. Eq.* (*4 C. E. Gr.*) *376; Greenville* v. *Seymour, 22 N. J. Eq.* (*7 C. E. Gr.*) *458; Schumm* v. *Seymour, 24 N. J. Eq.* (*9 C. E. Gr.*) *143; Liebstein* v. *Newark, 24 N. J. Eq.* (*9 C. E. Gr.*) *200; Matthiessen, &c., Co.* v. *Jersey City, 26 N. J. Eq.* (*11 C. E. Gr.*) *247; McKinley* v. *Board of Chosen Freeholders, 29 N. J. Eq.* (*2 Stew.*) *164; Cape May Railroad Co.* v. *Cape May, 35 N. J. Eq.* (*8 Stew.*) *419.*

In *State* v. *Jersey City, 29 N. J. Law* (*5 Dutch.*) *441*, the legality of an assessment for the cost of a sewer was involved. It was claimed that the sewer was laid on a grade in non-conformity with the plans. and was therefore defective. The court of errors and appeals in affirming the judgment of the supreme court (on *p. 450*) says:

"The necessity or expediency of changes or alterations in the sewers are referred solely to the discretion of the water commissioners. If, in the progress of the work, they found these changes expedient or necessary, they were authorized to make them. A vast deal of evidence has been taken to prove that the change in the depth and grade of the bottom of the sewer is injurious to the value of the work. But who constituted this court a judge of that question? The statute refers it exclusively to the water commissioners, and their decision, however erroneous it may prove to be, must be final."

In *Van Reipen* v. *Jersey City, 58 N. J. Law* (*29 Vr.*) *262*, on *certiorari* to review the award of contracts for the supply of water to Jersey City, Mr. Justice Van Syckel (on *p. 268*) says:

"This court disclaims the right to interfere with the exercise of that discretion, which has been confided to the city officials, and to substitute its judgment for theirs. We are possessed of no expert knowledge upon the subject of water-supply which will enable us to pronounce with any confidence that the judgment of those to whom this municipal scheme is entrusted is not well founded. We cannot, therefore, enter into the discussion as to the comparative merits of the several bids under the proposals put forth. In that issue this court is not the constituted arbiter."

See, also. *State* v. *Freeholders of Essex, 23 N. J. Law (3 Zab.) 214;* State v. *Jersey City, 30 N. J. Law (1 Vr.) 148; Suburban Land Co.* v. *Vailsburg, 67 N. J. Law (38 Vr.) 461.*

In *Oakley* v. *Atlantic City, 63 N. J. Law (34 Vr.) 127,* it is laid down (at *p. 137*) :

"In the absence of fraud or palpable abuse of discretion on the part of the municipal authorities in the exercise of power granted by the legislature, the only question for judicial cognizance is whether there has been any violation of legal principles or neglect of prescribed formalities in entering into the engagement which is the subject of controversy."

It is not to be assumed that it is intended to hold that a court of equity may interfere by its injunctive powers to restrain municipalities and subordinate bodies from abusing a discretion lodged in them by the legislature, in the absence of special equities calling for its intervention. Under our system that function, except in some cases, where peculiar and extraordinary rights are affected, has always been exercised by the supreme court, and with adequate relief to suitors :

"Since equity has no supervisory power over municipal corporations, or over the acts and proceedings of their officers, it will not interfere by injunction with the action of a municipality in matters of contract, when it is not shown that the rights of the citizen seeking the relief have been either injured or menaced in a matter falling under some recognized head of equitable jurisdiction." *High. Inj.* § *1255.*

In *Tucker* v. *Freeholders of Burlington, 1 N. J. Eq. (Saxt.) 282,* the complainants protested in this court against the construction of a bridge by the board of freeholders, which they insisted would injure them irreparably. Chancellor Vroom in dissolving the injunction (on *p. 287*) said:

"If the board have power to act in the premises; if they have jurisdiction over the subject-matter, this court can take no cognizance of the complaints contained in the bill. The right of supervision and correction is in another tribunal. In England it belongs to the king's bench, and in this state to the supreme court. The principle is universal, that wherever the rights of individuals are invaded by the acts of persons clothed with au-

thority to act, and who exercise that authority illegally the persons aggrieved must seek redress by *certiorari*. It appertains to the general supervisory jurisdiction of the supreme court, exercising in that behalf the powers of the king's bench to correct abuses of that character. The jurisdiction is not a doubtful one, nor is the exercise of power under it novel, either in England or in our own state. It is, then, to the supreme court that the complainants must resort to have their grievances redressed, and not to the chancery." *Morris Canal Co.* v. *Jersey City, 12 N. J. Eq.* (*1 Beas.*) *252; Lewis* v. *Freeholders of Cumberland, 56 N. J. Law* (*27 Vr.*) *416; Rehill* v. *East Newark, &c., 73 N. J. Law* (*44 Vr.*) *220*.

Barring such instances as above noted, the jurisdiction of this court may with propriety be invoked only, when, after the delegated power has been legislated, there is fraud, actual or constructive, in its fulfillment. *Bond* v. *Newark, supra; Schumm* v. *Seymour, supra; Liebstein* v. *Newark, supra*.

On the argument it was suggested, and in the brief it was argued, but it is not alleged in the bill, that the act of 1907, by authority of which the sewer is being built, is unconstitutional, because of the same vice which existed in the act of 1903 (*P. L. 1903 p. 158*), as found by the court of errors and appeals in *VanCleve* v. *Passaic Valley Sewerage Commissioners, 71 N. J. Law* (*42 Vr.*) *574*. The legislation of 1907 was enacted to meet the situation pointed out by that opinion, and, in my judgment, it remedied the evils of the earlier legislation. If it is vulnerable on that ground the act ought to have been attacked in another tribunal. The complainants avail themselves of this point only for the purpose of defeating the execution of a part of the authorized work, and leave the legislation unassailed in so far as it applies to the construction of that part of the sewer concerning which they make no complaint. A preliminary injunction will not be granted on doubtful points of constitutional law. *Greenville* v. *Seymour, supra*.

The building of this sewer is a public work of inestimable importance and necessity to all of the inhabitants of the Passaic valley.

"The general principle  *  *  *  denying relief by injunction against the action of municipal bodies in matters properly resting within their jurisdiction, in the absence of fraud, applies with especial force to cases where the relief is sought against the construction by municipal corporations of works of public improvement, such as streets, bridges, public buildings, sewers and other like works pertaining to municipal government. And whenever such matters have been intrusted by law to the judgment and discretion of municipal officers or boards, equity will not revise or control the exercise of their discretion, or interfere with their action in the absence of fraud, and while they continue to act within the scope of the powers conferred upon them by law." *High Inj.* § 1270.

An important public work should not be delayed by an injunction except the right to be protected is clear and without serious doubt. *Pennsylvania Railroad Co.* v. *New York and Long Branch Railroad Co., 23 N. J. Eq. (8 C. E. Gr.) 157.*

In *Euston and McMahon* v. *New York and Long Branch Railroad Co., 24 N. J. Eq. (9 C. E. Gr.) 49,* the court says (at *p. 58*) :

"The work which it is sought to enjoin is a public enterprise of much importance to the people of this state, who, through their legislature, have authorized its construction. I find no evidence of bad faith on the part of the defendants, nor even any imputation of it. This court is always reluctant to stay the progress of such enterprises, and will only do so in a case clearly calling for its intervention."

The contentions that the complainants are in laches, and that to grant the relief prayed by the bill would impair the obligation of contract, are not, in my judgment, well founded, although it is not necessary to pass upon either point at this time. That the bill is defective for want of parties (the municipalities) cannot be gainsaid.

The injunction will be denied and the order to show cause dismissed, with costs.