**GEORGIA POWER CO. v. TENNESSEE VALLEY AUTHORITY et al.**

No. 126.

District Court, N. D. Georgia, Atlanta Division.

May 28, 1936.

674

Colquitt, MacDougald, Troutman & Arkwright and Harlee Branch, all of Atlanta, Ga., Barry Wright, of Rome, Ga., and Grady Head, of Ringgold, Ga., for complainants.

James Lawrence Fly, William C. Fitts, Jr., and Julian C. Chambers, all of Knoxville, Tenn., for defendants TVA.

SIBLEY, Circuit Judge.

The original bill removed from a state court seeks to enjoin Tennessee Valley Authority and Catoosa Farmers Co-operative Association, as trespassers, from putting wires for transmitting electricity above and across the wires of petitioner, to enjoin them and certain individuals from making false and fraudulent representations about the petitioner's business, and from attempting to organize a boycott of it. An amended bill seeks to enjoin the TVA from constructing any transmission or distribution lines in Georgia, especially any over state properties or highways to do a business in competition with petitioner, and to enjoin the other defendants from purchasing power from TVA; and for a declaration that the attempted business in Georgia of TVA is illegal, as being beyond any authority conferred on it by Congress and beyond federal constitutional power. The general contention is that TVA has no source of power in or near Georgia, and intends to purchase power from Tennessee Electric Power Company and distribute it in Georgia without the consent of the state and without submitting to the jurisdiction of the Georgia Public Service Commission or the payment of taxes, and that it is seeking unlawfully to take away the customers of petitioner, such activities being beyond the power given by Congress and beyond the power of Congress to give. The Tennessee Valley Authority alone has answered. Besides denying most of the allegations concerning it, it asserts that it is selling surplus power arising at Wilson Dam, but expects in a few years to have more arising at other dams nearer to Georgia; that the northwest Georgia territory here in question was refused service by the petitioner, Georgia Power Company, until TVA was approached by towns and farmers therein to sell them electric current and TVA agreed to furnish it, when activity of petitioner first began in the rural section; that the line under construction is to be fed temporarily by exchange of current with Tennessee Electric Power Company as already arranged for, but ultimately by lines of TVA connecting directly with its dams. The line is to be turned over to North Georgia Membership Corporation, a nonprofit co-operative association, so soon as the latter, already chartered, shall be organized, under a long-time purchase contract. It admits that it claims not to be subject to taxation or regulation by the state of Georgia, but denies that it has attempted or authorized any interference with petitioner's contracts with customers or sought to organize any boycott against it or tres-

passed in any manner upon its property or rights.

### Findings of Fact.

The evidence is in many points incomplete and unsatisfactory. The answer is not sworn to and operates only as pleading. The facts can be stated only tentatively and for present purposes. Georgia Power Company has a franchise to make and sell electric power throughout the state, has made a large investment, and has given good service at low rates compared to many others. It has not an exclusive franchise, but there are other companies operating in parts of the state and all are subject to competition. Rates to consumers are fixed by the Georgia Public Service Commission and cannot be departed from except by leave of the commission. The Georgia Power Company has been and is rendering service to a number of towns in the northwest part of the state, but had declined before 1935 to put in rural lines there. During 1935 individuals and towns in that territory sought to get electric current from TVA, which consented to supply them. After this the power company became active in extending its lines, and there has arisen an acute and even bitter rivalry touching which source of power shall be used. It is probable that untrue statements have been made and unfair efforts to upset rights of way and service contracts by persons on both sides, but the evidence does not establish authorization or knowing ratification by the power company or by TVA. As to the crossing of the transmission lines, the Georgia Power Company has a first-acquired right of way easement over the lands of one Russell and first erected its line. The easement is not expressed to be exclusive. Russell later gave a similar easement to TVA crossing the former. There is a contention that the crossing really takes place over an old roadway, the title to which is in the United States, but the evidence is not clear that this is true. There will be no actual interference by one wire with the other if they are properly installed and maintained. The wires of TVA have been put across the Western & Atlantic Railroad, which belongs to the state of Georgia, and across certain highways owned in fee by the state without asking the state's consent but without objection being made. Rights of way have been obtained as to all privately owned land. The Tennessee Valley Authority has surplus current at Wilson Dam and an arrangement for delivering it to Tennessee Electric Power Company there in exchange for like amounts of current less transmission losses at Oultawah, Tenn., at which point the TVA transmission line in Georgia ends. There is no proper proof of TVA's future intention as to other dams and transmission lines, but it is likely that they are as set forth in the answer. There is evidence that the North Georgia Membership Corporation has been chartered under Georgia laws to buy and operate the lines under construction by TVA and to distribute to rural customers electric currents at rates and on conditions to be named by TVA. The contract contemplated is described as "a standard power contract," which seems to mean one not only putting the fixing of consumers' rates at the discretion of TVA, but also the financial management of the membership corporation. The rates hitherto fixed by TVA for resale to consumers have been materially lower than those fixed for the Georgia Power Company by the Georgia Public Service Commission. TVA also contemplates furnishing current to the city of Dalton and other municipalities when their contracts with Georgia Power Company shall expire and when a modus vivendi between the two runs out a few months hence.

### Conclusions of Law.

The Georgia Power Company has a franchise to do the business involved in the territory in question, but it has no monopoly. It cannot object, for example, to competition by North Georgia Membership Corporation also chartered by the state to do such a business. But its franchise exercised by it in the territory does give it a standing to question the right of TVA to operate there if TVA has no lawful right. Reserving for the present the question of TVA's right, I hold that no trespass is shown by the crossing of the Georgia Power Company's right of way by the TVA wires. The landowner Russell in giving Georgia Power Company a right of way to string wires across his land could still use his land in any way that did not obstruct the easement he had granted. He could run telephone or other wires of his own over or under the power company's wires in a safe and proper way without the consent of

the latter. He could also grant to TVA the right to do so. If there should be interference, of course, the latter easement will have to yield to the older one. Whether the crossing of the railroad and highways, title to which is in the state of Georgia, be a trespass or not is a thing of no interest to Georgia Power Company. It cannot complain of that.

 Whether if TVA rather than North Georgia Membership Corporation and the several towns shall be found retailing power to individual consumers, it will be subject to have its rates fixed by the Georgia Commission, and whether if TVA wholesale power to the Membership Corporation and the towns under contracts which undertake to fix the rates to consumers, such rates will be governed by the contracts or by the action of the Georgia Public Service Commission, are questions that must wait until they take concrete form with all interested parties before the court. The great question which now presses for decision is whether TVA is so clearly without statutory or constitutional authority to do what it is about to do in Georgia as that it should be halted in its tracks. There has been some argument that interstate transmission of electricity is interstate commerce, but its local distribution is domestic commerce, but I think the matter immaterial. The federal power over interstate commerce is to regulate it, not to engage in it. TVA gets no help from that source. Its activities in selling electric power as pointed out in Ashwander et al. v. Tennessee Valley Authority, 56 S.Ct. 466, 80 L.Ed. ——, rest on the constitutional right of the United States to dispose of their property. That decision settles that electric energy generated at Wilson Dam and not needed for governmental purposes may be sold under authority of Congress, and that to effect sale transmission lines may be bought or built to a market for it, and this was held although evidently the contemplated sale was not a transient or casual one, but a continuous operation amounting to a business. Several distinctions are here urged. One is that the state of Alabama had there consented to what was done and here Georgia has not. But Georgia is not objecting, and the Georgia Power Company cannot object for it. And I cannot conceive that the power of the United States to dispose of their property, assented to by Georgia in ratifying the Constitution, contemplates that the permission of a state must be had before federal property can be disposed of within it.

 A better point is urged that the disposition here attempted is a continuous effort to control the price of electric power in Georgia through a congressional commission, the TVA, rather than through the Georgia Public Service Commission, and that this is to undermine and subvert a legitimate function of the state and to upset its arrangements for the welfare of its citizens and its power producers. Despite the breadth of the constitutional provision for disposal of federal property and of the discretion of Congress necessarily consequent, it is to be implied that Congress will not needlessly embarrass or injure the functions of the state. I do not therefore think TVA could be authorized to do all that it is charged with intending to do. Nor do I think it has been so authorized. Section 10 of the Tennessee Valley Authority Act of 1933, as amended, 16 U.S.C.A. § 831i, authorizes the sale of surplus power according to the policies therein set forth by contracts not exceeding twenty years, giving preference to states, counties, municipalities, and co-operative organizations not organized or doing business for profit. A policy is expressed of promoting the use of electricity on farms within a reasonable distance of transmission lines, and of constructing transmission lines to farms and small villages not otherwise supplied with electricity at reasonable rates. Thus to encourage the development of a new market for electricity rather than to invade an old one seems to be most considerate of existing interests and not of any detriment to the state. That the new market is small and not immediately profitable to the seller of electricity is for the consideration of Congress. The policy of selling by preference to those who though middlemen pass all profits to the consumer does discriminate against most power companies, but it seems to me to be within a seller's right to choose his customers. Power companies are not altogether ruled out. The provisions of the section which authorize the TVA to make rules and regulations about the distribution of power sold and rates for the resale of it go beyond the usual rights of a seller, and may on a proper challenge be found unreasonable in themselves or

in their exercise, but their failure would not nullify the entire act. The lines which TVA is now building whether for its own use or for transfer to North Georgia Membership Corporation are within its lawful power. That for the present they will be fed by current interchanged with Tennessee Electric Power Company is no objection. The interchange enables TVA to sell its power at Wilson Dam which otherwise would go unsold. The interchange is a mode of sale.

After the World War, the United States had vast amounts of surplus property of general utility and sold it in various ways at wholesale, in job lots, and even at retail in such markets and to such customers as seemed proper. No attempt, however, was made to open a retail store to be run for years with a constantly replenished stock, paying no taxes or license fees. The federal penitentiaries are full of human and economic values going to waste, and there is earnest effort to employ usefully the inmates. The things thus produced as a by-product of fumbling human justice can be sold if not used by the United States, but the Congress has always been solicitous to avoid competition with outside producers. The United States have purchased vast forest reserves in order to control floods and promote navigation, and inevitably trees grow in them. These need not be left to die and rot, but may be sold, and no doubt a railroad may be built to carry them to a market, but one would doubt that Congress could establish planing mills and chair factories in our cities under guise of selling its timber. These illustrations suggest that there must be limits as to the ways in which electricity may be disposed of. The limits of decency are for Congress to consider. Those of power alone are for the courts. I cannot say that any limit of power has yet been transgressed by TVA in this case.

Preliminary injunction is accordingly refused, but with leave to either party to apply further in case of any future fraudulent or false statements to present or prospective customers made by the authority or connivance or encouragement of the other, or of any wrongful attempt by either party to induce customers or grantors of rights of way to break their contracts, or to organize any illegal boycott.