TENNESSEE VALLEY AUTHORITY et al. v. TENNESSEE ELECTRIC POWER CO. etc.

No. 7606.

Circuit Court of Appeals, Sixth Circuit.

May 14, 1937.

MOORMAN, Circuit Judge, dissenting in part.

James Lawrence Fly, of Knoxville, Tenn., and John Lord O'Brian, of Buffalo, N. Y. (William C. Fitts, Jr., of Knoxville, Tenn., on the brief), for appellants.

Raymond T. Jackson and Newton D. Baker, both of Cleveland, Ohio (Charles M. Seymour, of Knoxville, Tenn., and Chas. C. Trabue, of Nashville, Tenn., on the brief), for appellees.

Before MOORMAN, SIMONS, and ALLEN, Circuit Judges.

## SIMONS, Circuit Judge.

Nineteen corporations in the business of generating, transmitting, and distributing electric energy as public utilities in the area within and contiguous to the Tennessee river basin commenced a suit in the chancery court at Knoxville, Tenn., against the Tennessee Valley Authority, a corporation organized under special act of Congress, and the three directors of that corporation, to restrain acts being performed or threatened under powers claimed to be conferred by the TVA Act (as amended, 16 U.S.C.A. § 831 et seq.). They allege such acts to be either unauthorized or conferred by an unconstitutional grant of power. The suit was removed by the defendants to the United States District Court for the Eastern District of Tennessee. There a temporary injunction was granted, and the appeal is from the interlocutory decree. The Georgia Power Company, one of the plaintiffs, being restrained by an injunctional order subsequently issued out of the District Court for the Northern District of Georgia, and the Alabama Power Company, another, similarly restrained by the District Court for the Northern District of Alabama (Ashwander v. Tennessee Valley Authority, 19 F.Supp. 190), withdraw their support of the decree, but the remaining plaintiffs defend it.

The bill charges the defendants with having promulgated a program for the construction, development, and operation of a great federally owned and operated public utility system for the generation, transmission, and distribution of electricity, in all territory within physical transmission distance of the electric generating plants to be constructed under such program. It charges that with or without the authority of the act they contemplate construction of generating plants at 149 power sites on the Tennessee river and its tributaries, the construction of transmission and distribution lines to gridiron the entire area within 250 miles of such plants; that they plan to produce an amount of electric energy greatly exceeding the total consumption of the area, which includes all of the state of Tennessee and a large part of the six neighboring states. It charges that the execution of this program will irreparably injure if not wholly destroy the business and property of each of the plaintiffs, and that the defendants have already performed or are in process of performing a vast number of acts in the execution of their power program, which is being carried out as rapidly as possible. It charges the program itself, and all of the acts done pursuant to it to be unconstitutional and void, and that if the TVA Act purports to authorize such program, it is to that extent also unconstitutional and void. The defendants first challenged the jurisdiction of the court by motion to quash service of the subpoena, and later the sufficiency of the bill by a motion to dismiss. Upon the overruling of both motions they answered, denying the material allegations of the bill and challenging by supporting affidavits the right of the plaintiffs to either permanent or temporary relief. Their appeal not only assails the preliminary injunction, but brings up the jurisdictional and procedural questions decided against them below.

Jurisdiction must, of course, be first examined. The Tennessee Valley Authority is a public agency. By the terms of the statute creating it, its domicile is in Alabama. Therefore it is asserted that under the laws of Tennessee actions against it are local and not transitory, and may be brought only in a court of competent jurisdiction at the place of its domicile, and this notwithstanding the fact that the bill charges lack of legal or constitutional authority for acts being or threatened to be performed in Tennessee.

Section 4 of the Tennessee Valley Authority Act (as amended, 16 U.S.C.A. § 831c), specifically provides that the corporation may sue and be sued in its corporate name. This provision is without qualification. Section 8 (a), 16 U.S.C.A. § 831g (a) is as follows:

"The Corporation shall maintain its principal office in the immediate vicinity of Muscle Shoals, Alabama. The Corporation shall be held to be an inhabitant and resident of the northern judicial district of Alabama within the meaning of the laws of the United States relating to the venue of civil suits."

The laws relating to venue of civil suits are well understood, particularly since the clarification of their interpretation in Lee v. Chesapeake & Ohio Ry. Co.,

260 U.S. 653, 43 S.Ct. 230, 67 L.Ed. 443. The present suit was begun in a state court of Tennessee. Under the authority of section 28 of the Judicial Code (28 U.S.C.A. § 71), it was removed to that United States District Court within the jurisdiction of which the state court action was pending. Whether a suit may be removed depends upon whether it could have been brought originally in the federal District Courts, which by section 24 of the Judicial Code (28 U.S.C.A. § 41), so far as applicable, have original jurisdiction of all suits of a civil nature, at common law or in equity, which arise under the Constitution or laws of the United States. This being such a case, it could have been brought originally in a federal court. The test of removability is not whether the suit could have been brought in the particular district to which it was removed, but whether it could have been brought at all in a federal District Court. The venue of such suit after removal is not the district in which it might have originally been brought, but is the district in which the case is pending; for the right to remove is a personal privilege of the defendant, which he may assert or may waive. General Investment Co. v. Lake Shore & Michigan Southern Ry. Co., 260 U.S. 261, 275, 43 S.Ct. 106, 112, 67 L.Ed. 244. No question of federal jurisdiction here arises by virtue of section 8 (a) of the TVA Act (16 U.S.C.A. § 831g (a), and the laws in respect to venue.

▮ But while venue is waived by removal of a cause from a state into a federal court, want of jurisdiction in the state court is not cured thereby, but may be asserted after removal is consummated. Lambert Run Coal Co. v. Baltimore & Ohio R. Co., 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671; Cain v. Commercial Publishing Co., 232 U.S. 124, 131, 34 S.Ct. 284, 58 L.Ed. 534; General Investment Co. v. Lake Shore & M. S. Ry. Co., supra, 260 U.S. 261, 288, 43 S.Ct. 106, 117, 67 L.Ed. 244. It is first urged on behalf of the appellants that they may not be sued in Tennessee because no local statute specifically authorizes suit against a public agency. Section 8676, Shannon's Code 1932, however, provides that any corporation claiming existence under the laws of the United States is subject to suit in Tennessee to the same extent as are local corporations. Denial of the applicability of this statute, based upon the rule that statutes which refer to corporations in general terms do not apply to public agencies, is not persuasive, for the Tennessee statute speaks not in general terms but with precision.

▮ The principal challenge, however, to the jurisdiction of the Tennessee court is based upon the fact that the TVA Authority, being a public agency domiciled in Alabama, may not under the laws of Tennessee be sued in that state since actions against a public agency are local and not transitory, and suit may be brought against it only at its domicile. Authority for the Tennessee rule invoked is the leading case of Board of Directors of St. Francis Levee District v. Bodkin Bros., 108 Tenn. 700, 69 S.W. 270. There a suit was brought in Tennessee against the Levee District, which was a public corporation of Arkansas authorized to build levees on the Mississippi river. The Arkansas statute authorized it to sue and be sued, but domiciled the corporation in Arkansas. The Supreme Court of Tennessee held actions against such a Board not transitory but local, and that they must be brought at the place of domicile, resting its conclusion upon a rule of public policy, convenience, and comity, which requires that public bodies should not be subject to the burden of carrying on lawsuits in scattered courts, since such suits inevitably hinder and delay the successful conduct of governmental functions.

There is no challenge to the soundness of the rule of the Bodkin Case. The question is whether it applies. The origin of, and the reasons underlying the rule were discussed by this court in Parks Co. v. City of Decatur, 138 F. 550, 553. There a municipality of Illinois was sued by attachment in the courts of Kentucky. It was said, "As elsewhere, the municipalities of Illinois are localized in their sphere of operations. They have no legal presence elsewhere, and its officials do not and cannot ordinarily represent it abroad, certainly not for the purpose of receiving service of process against it, or giving jurisdiction over it, in foreign courts. For this reason, and because of the public inconvenience resulting from carrying on a litigation in a distant forum, the rule has become quite generally recognized that such corporations cannot be sued elsewhere than in the venue of their location; and because the venue of the courts in the counties of England and in the states of the Union is usually, if not universally, coextensive with the boundaries of such counties, the rule is stated in the terms that a suit against a city or

town or other limited municipal district must be brought in the courts of the county, and the county itself is only suable there." In fact in Pack, Woods & Co. v. Township of Greenbush, 62 Mich. 122, 28 N.W. 746, the court indicated that the agents of a township may not bind the township by their acts or doings beyond the limit of the township unless expressly or impliedly authorized, for the localities in which they may exercise and perform them are limited by the boundaries of the township and the county in which it is located. The jurisdiction of a court may not therefore follow the persons of public officers wherever they may go beyond the municipalities for which they were elected or chosen. The Bodkin Case does not go beyond this. It construed the Arkansas statute as giving consent to suits against the levee board only where the board had its situs. Since it cannot have a situs outside of the state of its creation, it is not subject to suit in a foreign state, and the levee district as an agency of the government is analogous to counties, municipalities, boards of education, and the like.

The Tennessee Valley Authority has no restricted situs. It is authorized under the act to carry on operations upon the Tennessee river and its tributaries without respect to state lines or the limits of judicial districts, and may acquire by purchase or condemnation anywhere lands, easements, or rights of way necessary to carry out the provisions of the act. In the exercise of the power of eminent domain conferred upon it, it may institute proceedings in any District Court of the United States, within the jurisdiction of which required lands, easements, rights of way, or other interests are located. Indeed, so unfettered is it by political subdivisions that commissioners who are to ascertain the value of property are not to be selected from the locality wherein land sought to be condemned lies. Residence is not synonymous with situs, and the act creating the Authority is replete with provisions pointing to its mobility and the transitory character of its activities. Neither the rule of the Bodkin Case nor the reasons which gave it birth limit jurisdiction over an ambulatory corporation of this character to the courts of its domicile. The state court had jurisdiction, and the court below acquired it by removal. It becomes unnecessary to consider other bases of jurisdiction asserted by the plaintiffs.

■ The challenge to the sufficiency of the bill is based upon two main grounds. It is said that the bill is defective because premised upon an alleged power program which is nonjusticiable and because of an improper joinder of parties and causes which renders the bill multifarious, in violation of Equity Rules 26 and 37, 28 U.S.C.A. following section 723. In our opinion the existence of multifariousness must depend upon whether a justiciable controversy is presented by allegations of irreparable injury flowing from the authorization, promulgation, and substantial initiation of the power program described in the bill. If there is no justiciable controversy between plaintiffs as a class and defendants, and one does not arise in respect to any plaintiff until some concrete act threatening irreparable injury to it is committed or threatened, such as the invasion of its territory by competing lines, the building of generating stations within transmission distance of its customers or the like, then indeed the bill may be clearly multifarious, and as we understand the argument, so much the plaintiffs are ready to concede. But if the unitary power program, as permitted or commanded by the act, or as promulgated by the directors of the Authority, directly creates or imminently threatens irreparable injury to the plaintiffs, varying in degree, perhaps, in respect to each but identical in kind, then we fail to see misjoinder either of plaintiffs or causes of action, for "a bill is not multifarious that presents a common point of litigation, the decision of which will affect the whole subject-matter, and will settle the rights of all the parties to the suit." Equity Rules, 28 U.S.C.A. following section 723, p. 114, compilers note 227. The general principle is well understood.

■■ In determining the sufficiency of the bill, we are not required to examine anything but the structure of the bill itself. Nelson v. Hill, 5 How. 127, 132, 12 L.Ed. 81. It becomes necessary, therefore, to consider the case made by it. The general program has been described—it remains to consider the injury charged to flow therefrom. Each of the plaintiffs has, it is alleged, valid authority by franchise or otherwise, to carry on its business in the territory it serves either indeterminately or for a period of years. Each operates within transmission distance of electric generating plants constructed, under construction or proposed. Each owns property of great value for the

890

distribution and generation of electric energy within its service territory, with rates fixed by state authority. Each is supplying public utility service as a going concern, with large investments devoted to that purpose. Each has numerous agreements with consumers and reasonable expectancy of renewal of contracts. Each has issued stocks and bonds purchased by the public on the faith and credit of its lawfully granted authority and the protection afforded such investments by the laws of the state and the Constitution of the United States. There exists, it is said, a common threat to the interests of each in that the Tennessee Valley Authority Act permits those charged with its administration to acquire and develop all the water power sites on the Tennessee river and its tributaries, to build and utilize steam plants auxiliary thereto, to interconnect vast electric generating plants into a super-power system, to acquire and construct transmission or distribution lines throughout the transmission area of these plants, and to distribute and sell power so generated to domestic, commercial, municipal, and industrial users of light and power, and the area embraced includes all or a substantial part of the territory in which each plaintiff operates.

In short, it is asserted that the act permits or commands, and the defendants propose, the construction, development and operation of a mammoth federally owned and operated system for the generation and distribution of electricity in competition with each plaintiff through all or a substantial part of its territory. Electricity so produced will be sold at a price with which private producers cannot compete because its sale is to be subsidized by the public treasury. It is the purpose of the act and of the persons charged with its administration to eliminate all existing privately owned and operated utilities. Not only is the mere existence of the statute a threat to their business because it depresses the value of their present securities and destroys the market for additional securities required to permit expansion and modernization of properties, but the defendants are threatening to go beyond the clear authority of the act by constructing and operating hydro-electric plants with auxiliary steam plants, by interconnecting such plants into a vast power system, and so to take over the entire market for electricity in the area. The defendants have announced that unless existing utilities sell their transmission lines to them such lines will be duplicated. They have announced their intention to regulate local intrastate rates and service by a so-called "yardstick" method through federally subsidized competition which will supplant state regulation as inadequate and unsatisfactory. Their power program will be carried out in Kentucky, Alabama, Georgia, North Carolina, Mississippi, and Tennessee, and will include such cities as Chattanooga, Knoxville, Birmingham, Memphis, and Atlanta. They have conspired with the Federal Public Works Administrator to force the existing utilities in the area, including the plaintiffs, to sell their properties for less than fair value, failing which their properties and services will be duplicated with moneys advanced by the Public Works Administration. In pursuance of this program, it is alleged, definite portions of the area have already been occupied, and the public has been offered contracts for electric energy at confiscatory prices in furtherance of a systematic campaign to injure the plaintiffs and destroy their credit and good will. The general allegations are supported by specific allegations, which it is neither necessary nor convenient to recite. In brief, as was urged in argument, the plaintiffs conceive themselves to be united by a common peril, and united therefore they complain.

To the justiciability of their common grievance, the defendants rely for a complete answer upon specific rulings of the Supreme Court in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 480, 80 L.Ed. 688. They lay the bill in the Ashwander Case by the side of the present bill, and by exhaustive comparative analysis urge the conclusiveness of that decision on the issue now under consideration. The "deadly parallel" is frequently devastating, but so only when controversies are substantially identical and of equal breadth. We have given careful consideration to the Ashwander Case. It sustains a constitutional power of TVA to enter into a specific contract with the Alabama Power Company, one of the original plaintiffs in the present suit. That contract related solely to the purchase by TVA of transmission lines for disposal of excess energy generated at Wilson Dam and for exchange of energy. The Ashwander Case was a derivative suit brought by preferred stockholders of the Alabama Power Company to set aside the contract as ultra vires. By limitations imposed upon the court by the nature of the

suit, and through limitations of the judicial process, the Ashwander Case was kept within very narrow compass.

It is well understood, of course, that a stockholder may not maintain a suit in behalf of his corporation until he has made a demand upon the corporation that it do so, and the corporation has failed or refused to comply. The scope of the suit he may then maintain is limited by the scope of his demand. Ashwander and his fellow-stockholders were primarily concerned with the contract of January 4, 1934, for the sale by the Alabama Power Company of the transmission lines running from Wilson Dam. The electric energy there generated was more than sufficient to supply all the requirements of the contract. The issues were confined to the constitutional authority for the construction by TVA of Wilson Dam, and for its disposal by reasonable method of the electric energy there generated. Finding the construction of Wilson Dam a valid exercise of constitutional power under the war and commerce clauses, the electric energy there generated to be property of the United States, for the sale of which authority exists in section 3 of article 4 of the Constitution, and the method of disposal not inappropriate according to the nature of the property, the court refused to set aside the contract, the decision concluding with the following: "The question of the constitutional right of the government to acquire or operate local or urban distribution systems is not involved. We express no opinion as to the validity of such an effort, as to the status of any other dam or power development in the Tennessee Valley, whether connected with or apart from the Wilson Dam, or as to the validity of the Tennessee Valley Authority Act or of the claims made in the pronouncements and program of the Authority apart from the questions we have discussed in relation to the particular provisions of the contract of January 4, 1934, affecting the Alabama Power Company."

It is true that the stockholders in the Ashwander Case sought a declaratory judgment with respect to the constitutional validity of the entire Tennessee Valley activity, and that the court did not recognize in their challenge to the act, or to other things done in pursuance thereof, a case of actual controversy within the scope of the Act of June 14, 1934 (Jud.Code § 274d, 28 U.S.C.A. § 400), providing for declaratory judgments, for "the judicial power does not extend to the determination of abstract questions," and a justiciable controversy does not arise save as pronouncements, policies, and programs have "fruition in action of a definite and concrete character constituting an actual or threatened interference with the rights of the persons complaining." The court had clearly in mind, however, that the persons complaining in the Ashwander Case were stockholders, whose interests might perhaps be affected by the invalidity of a specific contract entered into by their corporation, but not necessarily or immediately affected by other acts or assertions of authority on the part of the federal agency involved. This, we think, the court made plain: "While plaintiffs, as stockholders, might insist that the board of directors should take appropriate legal measures to extricate the corporation from particular transactions and agreements alleged to be invalid, plaintiffs had no right to demand that the directors should start a litigation to obtain a general declaration of the unconstitutionality of the Tennessee Valley Authority Act in all its bearings or a decision of abstract questions as to the right of the Authority and of the Alabama Power Company in possible contingencies."

The case made by the present bill presents a different aspect. Here are no preferred stockholders whose interests are limited to their distributive share in the assets of the corporation, and whose grievance is circumscribed by their own formulated estimate of it. Here are seventeen utility corporations already suffering the economic pinch of actual or threatened competition they conceive to be illegal, and facing what they conceive to be not only irreparable injury, but possible destruction, not through any one specific act of the defendants which singly considered may not be an unconstitutional exercise of power, but through a far flung program which they charge will inevitably effect and has for its very purpose their common annihilation. We are not convinced that the Ashwander decision precludes us from recognizing a justiciable controversy between these plaintiffs as a class and the Tennessee Valley Authority as an instrumentality of the government involving the constitutional validity of the described program, whether authorized by the act or transcending its authority.

Another consideration is of importance. Eighteen months have elapsed since the Ashwander decision in the Supreme Court. Three years have passed since the District

Court announced the decision there reviewed. We are told that the program of the Tennessee Valley Authority and its directors has gone forward with all reasonable dispatch. What then may have been merely tentative or speculative may now be approaching realization. What then was remote may now be imminent, and mere concept have fruition in action of a definite and concrete character constituting an actual or threatened interference with the rights of those complaining. This may only be determined by full hearing on the merits. Moreover, the distinction between the case here made and that presented by the bill in the Ashwander Case is not only clear but is brought into bold relief by the dissenting opinion in the Ashwander Case. The injury and threat of injury is here assigned not to a single act or series of acts, but to the entire program, the full sweep of which is illustrated by the acts already done and proposed. The primary grievance in the Ashwander Case related to the constitutional power of TVA to execute a specific contract. It was thought by the plaintiffs there to demonstrate invalidity of the contract not merely by challenging the power of the Authority to execute it, but by challenging its power to promulgate and carry into execution a power program of which the assailed contract was but a part, and to test the validity of the very act under the authority of which the program was conceived—even to the extent of seeking a declaratory judgment thereon. The power program was involved only as its possible invalidity might infect with invalidity the assailed contract. The dissent makes it clear that the court rejected the theory that "the plan makes the part unlawful." So while it results that one may not secure relief against an act which is not itself an unconstitutional exercise of power, it also results that one may not complain of a plan which, though possibly open to attack on the ground of constitutional invalidity, does not as such injure him, and this is but an application of the familiar principle that courts will not pass upon the constitutionality of a statute per se, but will set it aside only when both invalidity and direct or imminent danger of injury to the persons complaining of its enforcement are made clear. Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078. The court below did not err in overruling the motion to dismiss.

We reach, therefore, the question as to whether, upon the showing made, the plaintiffs have established their right to a temporary injunction of the scope granted, and upon this issue it is not necessary for us to determine the meritorious question as to the constitutional validity of the power program, for the ultimate rights of the plaintiffs should be decided only when the court is "in possession of the materials necessary to enable it to do full and complete justice between the parties." Eagle Glass & Mfg. Co. v. Rowe, 245 U.S. 275, 38 S.Ct. 80, 83, 62 L.Ed. 286; Interstate Transit Co. v. City of Detroit, 46 F.(2d) 42 (C.C.A.6). Ordinarily, upon an appeal from an interlocutory order granting or refusing a temporary injunction, the determination of the trial court will not be disturbed "unless contrary to some rule of equity, or the result of improvident exercise of judicial discretion." Meccano, Ltd., v. John Wanamaker, 253 U.S. 136, 141, 40 S.Ct. 463, 465, 64 L.Ed. 822; City of Owensboro v. Cumberland T. & T. Co., 174 F. 739, 747 (C.C.A.6). The question here presented is not unattended with difficulty. It involves not only the substantial nature and debatable character of the claims of the plaintiffs, the probability of irreparable injury to them, the necessity and appropriateness of an injunction to maintain the status quo, but includes also the usual questions of balance of equities, and the possibility of severe damage to the defendants and to the public interest if the temporary injunction is wrongly issued. Relief is moreover based upon transgression of constitutional power by and under an Act of Congress, and decision must ultimately if not presently be made with due regard to the presumption of validity that attaches to such enactment. Finally, the case presents the extraordinary situation in that the authority of the Congress to enact the statute in certain of its aspects, and to authorize thereby certain important transactions in respect to the construction of Wilson Dam, and to the sale and distribution by means of transmission lines of the electric energy there generated, has already been sustained by the Supreme Court, and that other acts and transactions here alleged to illustrate the sweep of the challenged power program are not readily to be distinguished from those heretofore validated. Granted that it is not necessary that the facts in support of a preliminary injunction be established with the same certainty that is required

upon final hearing, and that we are not required to prejudge the meritorious controversy, yet it would seem that in a case of this kind, giving full consideration to the history of the litigation, the gigantic public undertaking involved, the enormous sums of money already expended, the public interest which may not be ignored, and while carefully considering the irreparable injury claimed, considering also possible overbalancing injury to the defendants and the public, the gravity of the factual and constitutional questions involved must be made to appear at least with more clearness than in the ordinary case, if not indeed, as suggested in the concurring opinion in the Ashwander Case, "beyond peradventure clear."

Pursuant to the TVA Act, the Tennessee Valley Authority has now completed and put into operation not only the Wilson Dam, in the vicinity of Muscle Shoals, but the Norris Dam on the Clinch river, a tributary of the Tennessee river, and the Wheeler Dam on the Tennessee river. It has also initiated the construction of dams on the Tennessee river at Pickwick Landing, Tenn., at Gunthersville, Ala., and Chickamauga, in the vicinity of Chattanooga, Tenn., and has entered upon preliminary operations for the construction of the Hiwassee Dam on the Hiwassee river, near Murphy, N. C. It has also recommended to Congress the construction of three additional dams on the Tennessee river, which, it asserts, will complete the contemplated nine-foot channel from Paducah to Knoxville and provide a substantial measure of flood control on the Tennessee and Mississippi river systems. It has been selling approximately 75 per cent. of its available electric power to four of the plaintiffs, and its existing electric service is limited to consumers in the service area of these four companies and of three others complaining.

The District Judge found that the defendants had acquired or constructed extensive electric transmission and rural distribution facilities; had built and are building transmission lines which duplicate those of the plaintiffs; had erected a substantial number of miles of high tension transmission and distribution lines, most of them rural; were actively in competition with some of the plaintiffs, offering electric service at substantially lower rates, and that pending determination of the suit upon its merits the plaintiffs are in danger of irreparable injury through further enlargement and extension of facilities, solicitation and negotiation of contracts with actual or potential customers in the plaintiffs' service area, and that loss to the defendants by reason of the injunction would not be comparable to the damage likely to be suffered by the plaintiffs in the event the injunction should issue. Though he deemed it immaterial, he also concluded that the facts of record supported the following proposed finding:

"All of the transmission lines constructed or acquired, or under construction by the Tennessee Valley Authority, or physically connected with Wilson Dam are within transmission distance of Wilson Dam, except the Santeelah-Hiwassee Transmission line and sub-station. All of the power now being sold by the Authority is being delivered by means of these lines or by interchanges under the contract of January 4th. The present dependable capacity of Wilson Dam is in excess of the present power requirements of the existing customers of the Authority excluding complainant power companies. The present load now being sold to customers of the Authority other than the complainant power companies, is approximately 22,500 kw. The maximum amount of power that it is reasonably possible for the Authority to dispose of up to May 1st, 1937, by the use of facilities already existing or which may be constructed up to May 1st, 1937, is 37,000 kw."

Concluding that the suit raised grave questions both of law and of fact with reference to the validity of the Tennessee Valley Authority Act, and of the acts of the defendants done and being done in reliance upon it, he enjoined them from enlarging or extending their facilities other than the completion of certain lines and substations in process of construction, from serving consumers not already served, from initiating new construction, from soliciting or negotiating contracts with customers of the plaintiffs, or consumers in their service areas, from supplying service connections to existing rural lines, and in the main from enlarging the service beyond the scope of the project already established. While it is unnecessary to recite all of the provisions of the injunctional order, it must be conceded that it is sweeping. Less would perhaps not have sufficed the plaintiffs in view of the scope of their claims of irreparable injury, and more would doubtless have resulted in complete paralysis of the entire activity.

We have already indicated some of the considerations that must control decision upon the propriety of a temporary injunction. A complete catalogue cannot, of course, be compiled. A petitioner's own appraisal of his fears is not to be disregarded, so it is important to note that the bill when filed contained no prayer for preliminary relief, was not amended to pray for it until long after suit had been begun, and in this respect was brought up for hearing more than six months after its filing date. It is also important to note that the trial judge in the Ashwander Case, although subsequently holding the Tennessee Valley Authority's disposal of power illegal, refused to grant a preliminary injunction, and that Judge Sibley of the Fifth Circuit Court of Appeals, sitting by designation in the Northern District of Georgia, likewise refused to preliminarily restrain the activity of the defendants in the area served by the Georgia Power Company, one of the original plaintiffs here. Georgia Power Co. v. Tennessee Valley Authority et al. (D.C.) 14 F.Supp. 673, decided May 28, 1936.

However grandiose may be the conception of its directors as to ultimate scope of the TVA project, it is clear, we think, that the presently contemplated plan includes provision only for a nine-foot level for navigation and flood control purposes on the Tennessee river. This will be accomplished by the seven dams building and proposed. There is no occasion, therefore, on the question of irreparable injury pendente lite to consider the effect of 149 inter-connected power supplying projects upon the rights of the plaintiffs in the present inquiry, however important that may become on final hearing. Nor is it to be supposed that all or substantially all of the construction already entered upon or planned can possibly be completed before the pending case may be reached and tried upon its merits. The trial judge found substantial support for a finding that the maximum amount of power reasonably possible for the Authority to dispose of up to May 1, 1937, by the use of existing facilities, or those which might be constructed up to May 1, 1937, to be 37,000 kw. Without denying that some injury may be suffered if the injunction is lifted, it does not so clearly appear that it will of necessity overbalance the injury which must inevitably be suffered by the defendants and the public.

The possibility of maintaining the status quo by means of the injunction is not established. The court may not command the waters of the Tennessee river and its tributaries to cease their flow. The peculiar property that inheres in the power of falling water, and in the electric energy into which it may be translated, if not used, is forever lost. It is, moreover, inescapable that in the conduct of an activity of the size and scope herein delineated, a great organization must necessarily have been built up, including not only laborers, equipment, and executives, but technological experts and specialists of many kinds. To appraise the injury to the defendants from the disorganization which must follow, substantial or even partial cessation of activity is impossible, but that it will be great cannot be denied. So also in respect to the public interest involved. The loss, inconvenience, and discomfort of the residents of the area in failing to obtain cheap electric energy, if it be found in the end that it may lawfully be supplied to them, may likewise not be measured, but equally incontrovertible is it that it will be great. In so far, also, as restraint will delay effective control of the flood waters of the Tennessee river and its tributaries, the public interest in the achievement of that objective is similarly beyond appraisal. Human experience of the catastrophic effect upon great areas of overflowing rivers is too recent and too painful to permit of any doubt either as to the existence or extent of the public interest that is threatened by the maintenance of the injunction, and against which the threat to private interests must be balanced. From such possible injury, it is clear no bond can adequately safeguard the public interest.

There is no occasion at this time to review the principles which govern courts in passing upon constitutional questions. The cases announcing them have been collected in the concurring opinion of the Ashwander Case, and public attention is presently focused upon them. The great power of the courts to set aside an act of Congress is exerted with reluctance in the ordinary case. It is invoked with even greater caution where great public enterprises are involved, and while it will be exercised only when it is absolutely necessary, this applies with even greater force on appeals from an interlocutory injunction [Allen v. Omaha Live Stock Commission Co., 275 F. 1, 3 (C.C.A.8)], for as was said by Judge Learned Hand, "We are told that to declare a statute unconstitutional we must be assured beyond question that it is

such. A temporary stay now is a declaration for a time that it is unconstitutional; it is to dispense with the statute till the case be finally decided." Dryfoos v. Edwards (D.C.) 284 F. 596, 603.

It is our conclusion under all of the circumstances of the case that the interlocutory injunction was improvidently granted, and should be set aside. We have given serious consideration to both the private interests and the public enterprise involved, and while "Delusive interests of haste should not be permitted to obscure substantial requirements of orderly procedure" (Duke Power Co. v. Greenwood County, 299 U.S. 259, 268, 57 S.Ct. 202, 206, 81 L.Ed. ——), both are so important that undue delay in arriving at final judgment must likewise be avoided. To that end we have contributed as best we may by advancing the cause for argument and giving precedence to it in decision on present issues. We have no doubt that the District Judge, whose earnest application to the problems presented and whose courageous assumption of responsibility in respect to them is so evident upon this record, will cooperate with counsel to bring the cause to early hearing and disposition upon its merits.

Interlocutory decree reversed, and cause remanded for trial.

ALLEN, Circuit Judge.

I concur with the conclusion and in the main in the opinion, but think that in addition to ruling upon the questions raised in this appeal, the court should lay down rules for the guidance of trial courts as to the practice of issuing temporary injunctions which in effect suspend the operation of statutes.

The considerations which govern the issuance of temporary injunctions in a suit between private parties have often been applied in injunction suits against public officials, where the damage to the public is readily ascertainable and where the public interest may be properly protected. However, the decisions recognize a clear distinction where the damage to the public cannot be readily appraised and where the acts complained of involve, as here, a public policy authorized by statute, ordinance or order of a duly constituted public board or officer. Cf. Hurley v. Kincaid, 285 U.S. 95, 104 note, 52 S.Ct. 267, 269, 76 L.Ed. 637, 643; Lagunitas Water Co. v. Marin County Water Co., 163 Cal. 332, 125 P. 351; Jones v. Lassiter, 169 N.C. 750, 86 S.E. 710; Red "C" Oil Mfg. Co. v. Board of Agriculture (C.C.) 172 F. 695, affirmed 222 U.S. 380, 32 S.Ct. 152, 56 L.Ed. 240; Berdan v. Passaic Valley Sewerage Commissioners, 82 N.J.Eq. 235, 88 A. 202, affirmed 83 N.J.Eq. 340, 91 A. 1067. The public has an interest in the enforcement of all duly enacted law, and the citizens within the area of the Tennessee Valley Authority have a material and pecuniary interest in the enforcement of this particular law. Railroad Commission v. Central of Georgia Ry. Co. (C.C.A.) 170 F. 225, 232, 233. Cf. Cook Brewing Co. v. Garber (C.C.) 168 F. 942, 951. A preliminary injunction in such a case is rightly refused where it would be granted in a suit between private individuals. Cook Brewing Co. v. Garber, supra. Cf. New York City v. Pine, 185 U.S. 93, 97, 22 S.Ct. 592, 46 L.Ed. 820; Southern Counties Gas Co. v. City of Long Beach (D.C.) 295 F. 530, 533; Water Company of Tonopah v. Public Service Commission (D.C.) 250 F. 304. The delay in carrying out the statute resulting from issuance of a temporary injunction in cases similar to this is an injury to the public interest.[1] Where such a statute is suspended by preliminary injunction the damage to the public interest cannot readily be appraised, and the public interest cannot be protected by the giving of bond. The equities cannot be balanced, and the status quo, so far from being maintained, is destroyed.

MOORMAN, Circuit Judge (dissenting in part).

I agree to the setting aside of the injunction, not on the grounds stated in the opinion or concurrence, but for the reason

---

[1] "The litigation is likely to end sooner if no injunction is in force. Its dispatch is greatly dependent upon the conduct of the case by the complainants. They would not be inclined to press the case for speedy decision when they have once secured a preliminary injunction. As long as it stands, it is as good as any other, and experience shows that it often has practically the effect of a permanent injunction. Knowledge of this fact was probably one of the causes for the enactment of the statute allowing appeals from these interlocutory orders." Railroad Commission of Alabama v. Central of Georgia Ry. Co., 170 F. 225, 233 (C.C.A.5).

that in my opinion the bill does not state a case for judicial decision. The suit is an attack on the aims and purposes of the Tennessee Valley Authority as expressed in its "power program." Its purpose is to obtain a decree invalidating the program, not as an act or acts done or about to be done, but in its plans and purposes. This tenders an abstract issue only. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688, holds that it is not a justiciable question. I find none in the bill. To spell one out from one or another of its allegations of fact would make it defective for joinder of parties having interests too widely variant. I am of opinion, therefore, that the bill should be dismissed, and I dissent from the holding that it should not.